# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP827-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |         Plaintiff-Respondent-Petitioner, |
| |    v. |
| | Rory A. McKellips, |
| |         Defendant-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 361 Wis. 2d 773, 864 N.W.2d 106)
(Ct. App. 2015 – Published)
PDC No: 2015 WI App 31

| | |
|---|---|
| OPINION FILED: | June 28, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 7, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Marathon |
|   JUDGE: | Michael Moran |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | |
|   DISSENTED: | ABRAHAMSON, J. and BRADLEY, A. W., J. dissent (Opinion filed). |
|   NOT PARTICIPATING: | PROSSER, J. did not participate. |

ATTORNEYS:

For the plaintiff-respondent-petitioner, the cause was argued by *Katherine D. Lloyd*, assistant attorney general, with whom on the briefs was *Brad D. Schimel*, attorney general.

For the defendant-appellant, there was a brief by *Scott A. Swid, Benjamin J. Krautkramer*, and *Swid Law Offices, LLC*, Mosinee and oral argument by *Scott A. Swid*.

There was an amicus curiae brief by *Robert R. Henak* and *Henak Law Office, S.C.*, Milwaukee, on behalf of Wisconsin Association of Criminal Defense Lawyers.

**2016 WI 51**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2014AP827-CR
(L.C. No. 2011CF645)

STATE OF WISCONSIN : IN SUPREME COURT

State of Wisconsin,

Plaintiff-Respondent-Petitioner,

v.

Rory A. McKellips,

Defendant-Appellant.

**FILED**

**JUN 28, 2016**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the court of appeals. *Reversed.*

¶1 REBECCA G. BRADLEY, J. The State appeals the court of appeals published decision[1] reversing Rory A. McKellips' conviction after a jury found McKellips guilty of using a computer to facilitate a child sex crime contrary to Wis. Stat.

---

[1] See State v. McKellips, 2015 WI App 31, 361 Wis. 2d 773, 864 N.W.2d 106.

§ 948.075(1r) (2013-14).[2] The main issue in this case is whether the element, use of a "computerized communication system" in § 948.075(1r), was satisfied when McKellips used his flip-style cellphone to exchange texts with, and receive picture messages from, the fourteen-year-old victim.[3] We also address whether Wis. Stat. § 948.075 is unconstitutionally vague, whether the jury instruction on this charge was erroneous, and if so, whether this instruction was harmless, and whether the court of appeals erred when it exercised its discretionary authority under Wis. Stat. § 752.35 to reverse McKellips' conviction and remand for a new trial.

¶2 We hold the State satisfied its burden of proving the element, use of a "computerized communications system," because McKellips used his cellphone as a computer to send communications to the victim over the computer system used by their cellphones so that he could have sexual contact with her. We also hold that Wis. Stat. § 948.075 is not unconstitutionally

---

[2] The jury also convicted McKellips of restricting or obstructing an officer, contrary to Wis. Stat. § 946.41(1), but McKellips did not challenge that conviction in the court of appeals and does not do so here. In addition, the jury acquitted McKellips of repeated sexual assault of a child and exposing genitals or pubic area, contrary to Wis. Stat. §§ 948.025(1)(e), 939.50(3)(c), 948.10(1) and 939.50(3)(i). The Honorable Michael K. Moran presided in the circuit court.

All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

[3] The communications started when the victim was fourteen years old but continued after she turned fifteen years old.

vague because a person of ordinary intelligence would understand that using a cellphone to text or picture-message a child to entice sexual encounters violates the statute, and because the statute is capable of objective enforcement. Further, we hold that the jury instruction given here, although not perfect, when read as a whole, accurately stated the law. Even if the instruction were erroneous, it was harmless error. Finally, we hold that the court of appeals erred when it exercised its discretionary authority under Wis. Stat. § 752.35 to reverse McKellips' conviction. The real controversy was fully tried in this case; moreover, discretionary reversals under § 752.35 are limited to exceptional cases.

## I. BACKGROUND

¶3 Athens High School hired 56-year-old McKellips to coach the varsity girls' basketball team for the 2010-11 season. The Athens team was struggling to win games and McKellips had successfully coached other teams to state championships. In addition to coaching high school basketball, McKellips worked at Wausau Paper as a coal unloader.

¶4 In selecting the team for the 2010-11 season, McKellips chose two talented freshman to play on the varsity team: C.H. and her friend, T.R. During the season, McKellips called C.H.'s mother's home phone to praise C.H.'s basketball talent. He also called C.H.'s cellphone to tell her how well she played and talk to her about her potential to receive a college basketball scholarship. At the end of one of these phone calls, McKellips said "I love you." C.H. told T.R. about

3

this and realized McKellips was not having the same type of frequent contact with T.R.

¶5 After high school basketball season ended, C.H. continued to play basketball with an Amateur Athletic Union (AAU) tournament team. McKellips' cellphone contact with C.H. increased and expanded beyond the topic of basketball. In May 2011, C.H.'s AAU team played in a tournament in Minnesota. While in Minnesota, C.H.'s mother noticed C.H. talking on C.H.'s cellphone. When C.H. told her mother she was talking to McKellips, her mother told her to get off the phone and told C.H. that if her coach wanted to talk to C.H., he should call their home phone. C.H.'s father also told C.H. the same thing——that if her coach wanted to talk to her, he should call the home phone.[4] When C.H. told McKellips that he had to call the home phone to talk to her, McKellips bought C.H. a Motorola flip-style TracPhone without her parents' knowledge or permission.

¶6 On June 10, 2011, the Athens Varsity Softball Team played in the sectional playoff game in Wausau. C.H. was on the team. McKellips attended the game and met C.H. and her family at a restaurant afterwards. McKellips snuck the cellphone to C.H. at the restaurant.

¶7 On June 11, 2011, C.H. played in an AAU basketball game, during which she tore her ACL. Her mother picked her up and arranged to take her to McKellips' home because her mother

---

[4] C.H.'s parents were divorced and remarried. C.H. split time equally between her mother's and father's homes.

had other plans, did not want C.H. to be alone, and felt McKellips could help reassure C.H. regarding injury recovery. As McKellips helped C.H. into the car, he kissed C.H. on the cheek. After this, McKellips started calling her endearing names like "baby doll" and "sweetheart" and gave her gifts. Over the next several months, according to C.H., she engaged in a secret sexual relationship with McKellips.

¶8 On Labor Day in September 2011, the relationship ended when C.H.'s father found her secret cellphone. C.H. admitted McKellips had bought it for her. C.H. texted McKellips using a texting app on her iPod to warn him that her father had found the cellphone and to reassure McKellips that she would keep their secret. Over the next two days, C.H. told her parents about her relationship and sexual contact with McKellips. On September 7, 2011, C.H. told the police her accounting of what happened with McKellips. On September 9, 2011, Police Officer Matt Wehn went to talk to McKellips about what C.H. reported. When Wehn arrived at McKellips' workplace, Wehn asked for McKellips' cellphone. McKellips told Wehn that he had just dropped the cellphone in a coal pit but would try to recover it later that day. McKellips later admitted, however, that he lied about losing his cellphone, had hid the cellphone, and did not want to turn it over to police. Wehn took McKellips into the police station for questioning. McKellips denied having any sexual contact with C.H.

¶9 Police searched McKellips' workplace to look for his cellphone in the coal pit, but no phone was found. Three days

5

later, McKellips returned to his workplace to retrieve his phone from where he hid it. In May 2012, he gave his phone to his attorney who turned it over to police. The police investigation showed that between December 18, 2010 and July 27, 2011, there were 8,324 total contacts between McKellips' cellphone and C.H.'s regular cellphone (4,816 texts from C.H. to McKellips and 3,184 texts from McKellips to C.H.). Between June 10, 2011 and July 27, 2011, records show 2,426 total contacts between McKellips' cellphone and C.H.'s secret cellphone. McKellips' cellphone, when received by police, however, had no content on it from November 16, 2010 through July 28, 2011. Text messages between McKellips and C.H. on July 29-30, 2011 were recovered. These included an exchange of "love you" and McKellips' text to C.H., "Morning beautiful day yesterday." Police also recovered C.H.'s and McKellips' contacts on C.H.'s iPod from the day the secret cellphone was discovered.

¶10 The State charged McKellips with repeated sexual assault of a child, exposing genitals or pubic area, use of a computer to facilitate a child sex crime, and resisting or obstructing an officer. McKellips pleaded not guilty and the case was tried to a jury.

¶11 The State called 16 witnesses. C.H. testified first. She described how her relationship with McKellips developed. It started when he selected her to play for the varsity high school basketball team. Calls and texts from McKellips during that season generally focused on basketball. There was only one unusual call where he ended by saying "I love you." When the

6

season ended, the contacts with McKellips increased, and both of her parents told her this cellphone contact needed to stop. While in Minnesota for an AAU tournament, her mother got upset with her for talking to McKellips and told her he was her coach and could call the home phone. When C.H. told McKellips that, he said he would buy C.H. a cellphone so they could continue the contacts without her parents' knowledge. McKellips slipped her the newly-purchased cellphone when they met after a softball game. It was a Motorola flip-style TracFone that she activated and to which she added minutes so she could secretly communicate with McKellips. After C.H. tore her ACL, she convinced her mother to let her spend time with McKellips and his wife who were going to a grandson's baseball game. C.H. testified that this is when the first physical contact occurred: as McKellips helped her to the car and with his wife not around, McKellips kissed her on the cheek. After this incident, their cellphone contacts increased and McKellips started using relationship terms when talking to her such as "baby doll" and "sweetheart." He told her he loved her.

¶12 C.H. described four incidents of sexual contact:

> (1) June 2011. McKellips picked her up and took her to his house where they were going to make pies with his wife. McKellips' wife was not home and the pies were already made. C.H. testified that they sat on the couch in the living room where they kissed on the lips, he touched her under her clothes, and he pulled down his pants to expose

7

his erect penis. He put his hands on her head and brought her mouth to his penis and fluids came out of his penis. C.H. said this was her first sexual experience ever. She also explained that he touched the area where she had pubic hair and put his mouth on the area where she urinates. Afterwards, he drove her home and told her she could not tell anyone. After this incident, their cellphone contact increased to more than once a day.

(2) July 2011. McKellips stopped by her mother's home where C.H. was babysitting her one-year-old brother who was asleep. McKellips kissed her on the lips and slipped his hands into her pants touching her buttocks but on top of her underwear. McKellips also took her hand and placed it over his pants on his erect penis.

(3) July 29, 2011. McKellips picked C.H. up and took her to his house to help prepare for a fish fry he was hosting. He said his sister would be there helping but when they arrived at McKellips' home, his sister was not there. C.H. and McKellips were home alone and they sat on the living room couch kissing. McKellips touched her breasts under her shirt but over her bra, touched her vaginal area with his hands and mouth, and

8

put her mouth on his erect penis until fluids came out.

(4) August 2011. C.H.'s family was visiting her grandmother who lived near McKellips' house. C.H. convinced her mother to let her walk to his home where again C.H. and McKellips were alone. They sat on the living room couch kissing and another incident of oral sex occurred.

¶13 C.H. testified that in June and July of 2011, at McKellips' request, she sent him seven to ten picture messages of her, three of which were of her in her bra and underwear. After she sent the pictures, McKellips would tell her he liked them. She also described what happened when her father found the secret cellphone on September 5, 2011:

- She contacted McKellips to warn him that her father found the secret cellphone;

- She sent McKellips texts from her iPod: "I just told them the truth. Tht we hugged and a kiss on the cheek nothing physical. And idk what's going to happen bu[t] my parents said their not going to tell anyone just probably talk to u." And, "Tht I was all just txtin and we never did anything just txting and talk not actually doing anything."

- On September 6, 2011, at school, she borrowed her cousin A.B.'s cellphone to call McKellips and reassured him that she did not disclose the sexual nature of their relationship to her parents.

9

- That evening, she met with her mother, father, stepmother, and stepfather and disclosed everything that had happened between her and McKellips.

- On September 7, 2011, she reported this information to the police and gave them her secret cellphone and her iPod.

¶14 Other witnesses confirmed the details of C.H.'s testimony. A.B. testified that C.H. borrowed A.B.'s cellphone at school on September 6, 2011, called McKellips, and talked for 2.5 minutes. T.R., the other freshman selected for the 2010-11 varsity basketball team, testified that she did not receive frequent phone calls from McKellips and the ten to fifteen calls she did receive during the basketball season all pertained to basketball. Both girls testified they know C.H. to be a truthful person.

¶15 Guy Otte, the activities director at Mosinee High School, where McKellips previously coached varsity girls basketball, testified that he met with McKellips two times during McKellips' years at Mosinee to discuss the importance of maintaining proper boundaries with players and stressed that coaches should not give gifts to student athletes. Brad Tipple, C.H.'s AAU coach, also testified. He talked about how talented and hard-working C.H. was as a player. He saw no evidence that C.H. was depressed. As a coach, he does not have much contact with players outside of practice and games.

¶16 Danielle Diedrich, a teacher at Athens High School, testified that she coached the junior varsity girls basketball

10

team and assisted McKellips with the varsity team during the 2010-11 season. She told the jury C.H. was a great athlete who worked hard 100 percent of the time and did not have any mental health problems. She thought it was odd that McKellips kept calling C.H. at the AAU Minnesota tournament when he knew that Diedrich, his assistant coach, was at the same tournament. She also testified that she ran into McKellips at the Best Buy in Wausau when he bought what turned out to be the secret cellphone for C.H.

¶17 C.H.'s father T.H., her mother J.B., and C.H.'s stepfather testified next. T.H. testified:

- He caught C.H. talking to McKellips and warned her to stop as it could lead to problems.

- He found the secret cellphone, questioned his daughter and explained how upset she was——initially only admitting that McKellips had hugged her, kissed her on the cheek, and had exchanged text messages with her.

- C.H. eventually disclosed everything that happened and was very upset and did not want her parents and stepparents to tell anyone or call the police.

- C.H. was generally a truthful person.

¶18 J.B. testified:

- McKellips would call her home phone during the basketball season to talk about basketball games or how C.H. played.

- He gave the family gifts including Packers' jerseys for the whole family, a Buddha doll, and vegetables or fish.

11

- She was upset when she learned McKellips was talking to C.H. on her cellphone after school basketball season ended and told C.H. to tell him to use the home phone.

- She thought McKellips acted oddly when he met them at a restaurant in Wausau after C.H.'s sectional softball game.

- She confirmed that C.H. went to McKellips' home in June 2011 to make pies, that C.H. went to McKellips' home on July 29, 2011 to help prepare fish, and again in August when they were at the grandmother's house near where McKellips lived.

- On the day the secret cellphone was discovered, J.B.'s phone records showed that McKellips called her multiple times and when she finally talked to him that day, J.B. did not disclose to McKellips that the secret cellphone had been found; McKellips told J.B. he was trying to reach her because he had an extra ticket for a Brewers game.

- C.H. is generally a truthful person and although she was sad about hurting her knee, she was not depressed.

¶19 C.H.'s stepfather testified about how much C.H. loved basketball, what happened when the secret cellphone was discovered, and how difficult it was to hear C.H. disclose what happened with McKellips. He also described McKellips' unusual behavior at the Wausau restaurant.

¶20 Steve Cotey and Robert Fochs both worked as supervisors at Wausau Paper. Cotey testified that on September

12

9, 2011, the front office called and said the police were there asking to speak with McKellips. When Cotey told McKellips a police officer was asking to speak with McKellips, McKellips did not seem surprised. Fochs told the jury about the Mosinee Chief of Police Kenneth Muelling asking for his help to search for McKellips' cellphone, which McKellips claimed he dropped in a coal pit. After searching McKellips' work area, personal locker and truck, no phone was located. Muelling's testimony confirmed the search with Fochs.

¶21 Theresa Steiber testified that she was friends with McKellips' 33-year-old daughter, B.B., and that McKellips coached their basketball team in 7th and 8th grade as well as high school. Steiber told the jury that as a 7th and 8th grader, McKellips made her feel uncomfortable because he expressed his love for her in letters, gave her jewelry and a Bulls jacket, held her hand, rubbed her leg, and gave her back rubs. McKellips would say things to her like "if only he was 30 years younger," and she tried to avoid him because of this conduct. Steiber testified that McKellips' behavior stopped when she started high school.

¶22 Ryan Kaiser testified for the State as a cellphone expert witness. He told the jury:

- The Mosinee police asked him to examine the flip-style cellphone involved in this case.
- This type of phone had logical functions including "computing the data you are typing into it" and that it

13

had predictive texting, which puts the words on the screen before the user is done typing them.

- This phone had memory, took and saved pictures and videos, and had some internet capabilities.

- There are internal impulses in the phone that made the device function; when the user pushed buttons, information was sent through the device creating images on the screen.

- All cellphone carriers are connected to a server and use a computer system or computer network especially when sending text messages.

¶23 The State's last two witnesses were Athens Chief of Police Aaron Stencil and City of Mosinee Police Officer Matt Wehn. Stencil testified about taking C.H.'s statement on September 7, 2011 and described how C.H. was crying and upset. Wehn testified that:

- He gathered all the cellphone records in this case and created an exhibit documenting the phone numbers and contacts between the various phones.

- Between December 18, 2010 and July 27, 2011, there were 8,324 contacts between McKellips' cellphone and C.H.'s regular cellphone. McKellips received 4,816 text messages and sent 3,184.

- Between June 10, 2011 and July 27, 2011, there were 2,426 total contacts between McKellips' cellphone and C.H.'s secret cellphone.

14

- McKellips activated a new cellphone on July 30, 2011 and the first phone call he made was to C.H.'s secret cellphone. Using the new phone, between July 30, 2011 and September 5, 2011, McKellips sent 77 texts to C.H.'s secret cellphone and received 191 texts. McKellips' phone used 4,224 minutes during that time.

- McKellips' cellphone received ten multimedia messages from C.H.'s secret cellphone. Multimedia messages "would be anything from video to pictures to a voice file, an electronic file, as opposed to just the written word."

¶24 Wehn also told the jury that as a part of his investigation, on September 9, 2011, he went to Wausau Paper to talk to McKellips. When he arrived, McKellips told him he had dropped his cellphone in the coal pit. Wehn learned McKellips had not really dropped his cellphone in the coal pit, but hid it because he did not want to turn it over to police. Wehn took McKellips into the police station for questioning. The audio recordings of McKellips' statements were played for the jury.

¶25 In May 2012, Wehn collected McKellips' cellphone from his attorney and it was in good condition, but there were no messages from or to C.H. on the cellphone. Wehn also testified about the last contacts on C.H.'s regular cellphone to McKellips' cellphone the night of September 5, 2011: one text at 7:01 p.m. and two incoming calls from McKellips, one of which was answered at 7:05 p.m.

¶26 The defense called four witnesses. McKellips' daughter B.B. testified that she does not remember her father

15

acting inappropriately toward her friend, Theresa Steiber, and that she bought the Bulls jacket for Steiber. C.S., McKellips' sister, testified that on the fish-fry night, McKellips and C.H. were never alone in the house or his truck. Connie McKellips, McKellips' wife, testified that they treated C.H. like their own daughter, C.H. liked spending time with them because her parents were fighting, they helped C.H. with her depression, and C.H. was never alone in their home with McKellips. The last defense witness was McKellips. He testified:

- He never had any sexual contact with C.H. and they were never alone inside his home.

- He did give C.H. a hug and kiss on the cheek after she was injured.

- He regularly called his players "baby doll" and said "I love you" to all of them.

- He bought the secret cellphone for C.H. to help her because she was depressed and suicidal; C.H. asked for the phone.

- He never downloaded any pictures from C.H. as he did not know how to do so.

- He admitted lying to the police about dropping his cellphone in the coal pit; he lied because he believed C.H.'s iPod text on his cellphone would help him and he did not want it to get erased.

- He never touched C.H. at her mother's house.

- He talked to C.H. a lot because she was "needy."

16

- He admitted C.H.'s parents did not know about the secret cellphone.

¶27 After closing arguments, the trial court instructed the jury.  It gave the standard jury instruction on "use of a computer to facilitate a child sex crime," as well as a supplemental instruction and definition of computer:

> The third count of the information charges that the defendant, Rory McKellips, on or about May 1st, 2011, to August 31st of 2011, in the City of Mosinee, Marathon County, Wisconsin, did use a computerized communication system to communicate with an individual who the actor believed, or had reason to believe, had not attained the age of 16 years, with intent to have sexual contact with the individual, or sexual intercourse with the individual.
>
> To this charge, the defendant has also entered a plea [of] not guilty, which means the state must prove every element of the offense charged beyond a reasonable doubt.
>
> Section 948.075 is violated by a person who uses a computerized communication system to communicate with an individual who the person believes, or has reason to believe, has not attained the age of 16 years with intent to have sexual contact or sexual intercourse with the individual.  Before you may find the defendant guilty of this offense, the state must prove by evidence which satisfies you beyond a reasonable doubt that the following [four] elements were present.
>
> Number one.  That the defendant used a computerized communication system to communicate with an individual.
>
> Number two.  That the defendant believed or had reason to believe that the individual was under the age of 16 years.
>
> Number three.  That the defendant used a computerized communication system to communicate with

17

the individual with intent to have sexual contact with the individual.

Number four.   That the defendant did an act in addition to <u>using a computerized communication system</u> to carry out the intent to have sexual contact.

[Evidence has been received that the defendant communicated with a child under the age of 16 via a mobile or cellphone.   You must determine whether the phone described in the evidence constitutes a computerized communication system.

To aid you in that determination, you are instructed that under Wisconsin law, a computer is defined as -- computer is defined as computer, which means an electronic device that performs logical, arithmetic, and memory functions by manipulating electronic or magnetic impulses, and includes all input, output, processing, storage, computer software and communication facilities that are connected or related to a computer in a computer system or computer network.   Computer system is defined as a set of related computer equipment, hardware, or software.]

Sexual contact is an intentional touching of an intimate part of C.[]H. by the defendant.   The touching may be of an intimate part directly, or it may be through the clothing.   The touching may be done by any body part or by any object, but it must be an intentional touching.   Sexual contact also requires that the defendant acted with intent to become sexually aroused or gratified.

You cannot look into a person's mind to find intent and belief.   Intent and belief must be found, if found at all, from the defendant's acts, words, and statements, if any, and from all the facts and circumstances in this case bearing upon intent and belief.

If you are so satisfied beyond a reasonable doubt that all [four] elements of this offense have been proven, you should find the defendant guilty.   If you are not so satisfied, you must find the defendant not guilty.

18

Wis JI——Criminal 2135 (Apr. 2013)(emphases added; third set of brackets contains supplemental instruction).

¶28 The jury convicted McKellips on the Wis. Stat. § 948.075 charge and obstruction, but acquitted him of the other two charges. He was sentenced to 15 years, consisting of ten years of initial confinement followed by five years of extended supervision on the computer charge and nine months concurrent on the obstruction charge. McKellips appealed the conviction to the court of appeals, arguing (1) he did not violate Wis. Stat. § 948.075 because his cellphone did not use the internet; (2) § 948.075 is unconstitutional; and (3) the circuit court erroneously exercised its discretion when it admitted other acts evidence. The court of appeals did not decide these issues. Instead, it <u>sua sponte</u> held that the jury instruction on § 948.075 "misdirected" the jury by asking it to determine whether the cellphone itself constituted the computerized communication system instead of asking the jury "whether McKellips' various alleged uses of the cell phone constituted communication via a computerized communication system." <u>State v. McKellips</u>, 2015 WI App 31, ¶22, 361 Wis. 2d 773, 864 N.W.2d 106. The court of appeals exercised its discretionary authority under Wis. Stat. § 752.35, reversed McKellips' conviction, and ordered a new trial in the interest of justice because "the real controversy was not tried." <u>Id.</u> The State petitioned this court for review, which we granted.

II. STANDARD OF REVIEW

19

¶29 This case involves the interpretation and application of Wis. Stat. § 948.075, which is a question of law that we review independently.  See Shannon E.T. v. Alicia M. V.M., 2007 WI 29, ¶31, 299 Wis. 2d 601, 728 N.W.2d 636.  Our standards for interpreting statutes are well-known and need not be repeated here.  See State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶¶44-52, 271 Wis. 2d 633, 681 N.W.2d 110.  This case also involves a constitutional challenge to § 948.075, which likewise presents a question of law requiring our independent review.  See Aicher v. Wis. Patients Comp. Fund, 2000 WI 98, ¶18, 237 Wis. 2d 99, 613 N.W.2d 849.  "Statutes are presumptively constitutional.  The court indulges every presumption to sustain the law if at all possible, and if any doubt exists about a statute's constitutionality, we must resolve that doubt in favor of constitutionality."  Id., ¶18 (internal citation omitted).

¶30 In addition, this case involves our review of the jury instruction on the Wis. Stat. § 948.075 charge.  Although a circuit court has broad discretion when instructing a jury, we review independently whether the instructions given accurately stated the law.  See State v. Beamon, 2013 WI 47, ¶18, 347 Wis. 2d 559, 830 N.W.2d 681.  If the jury instructions did not accurately state the law, then the circuit court erroneously exercised its discretion.  State v. Ferguson, 2009 WI 50, ¶9, 317 Wis. 2d 586, 767 N.W.2d 187.  We, however, do not review a particular instruction in isolation; instead, we analyze the instructions as a whole to determine their accuracy, viewing

20

them in the context of the overall charge. See State v. Pettit, 171 Wis. 2d 627, 637, 492 N.W.2d 633 (Ct. App. 1992). Finally, we review the court of appeals' exercise of its discretionary authority under Wis. Stat. § 752.35, which requires us to determine whether the court of appeals erroneously exercised its discretion in granting McKellips a new trial in the interest of justice. See State v. Johnson, 149 Wis. 2d 418, 428-29, 439 N.W.2d 122 (1989), confirmed on reconsideration, 153 Wis. 2d 121, 449 N.W.2d 845 (1990). "Reversals in the interest of justice should be granted only in exceptional cases." State v. Kucharski, 2015 WI 64, ¶23, 363 Wis. 2d 658, 866 N.W.2d 697 (emphasis added).

### III. ANALYSIS

#### A. Application of computerized communication system

¶31 The main dispute is whether an exchange of texts and picture messages between flip-style cellphones constitutes use of a "computerized communication system" in Wis. Stat. § 948.075(1r). The State argues that such exchanges satisfy that term. McKellips disagrees, and asserts that the term is only satisfied when the internet is involved. We agree with the State.

¶32 Wisconsin Stat. § 948.075, entitled, "[u]se of a computer to facilitate a child sex crime," provides:

> (1r) Whoever uses a computerized communication system to communicate with an individual who the actor believes or has reason to believe has not attained the age of 16 years with intent to have sexual contact or sexual intercourse with the individual in violation of s. 948.02 (1) or (2) is guilty of a Class C felony.

21

(2) This section does not apply if, at the time of the communication, the actor reasonably believed that the age of the person to whom the communication was sent was no more than 24 months less than the age of the actor.

(3) Proof that the actor did an act, other than use a computerized communication system to communicate with the individual, to effect the actor's intent under sub. (1r) shall be necessary to prove that intent.

"Computerized communication system" is not defined in this statute, but under statutory interpretation rules, we may apply the ordinary and accepted meaning of this term unless it has a technical or special definition. See State ex rel. Kalal, 271 Wis. 2d 633, ¶45. In doing so, we may use a dictionary to establish the common meaning of an undefined statutory term. State v. Sample, 215 Wis. 2d 487, 499-500, 573 N.W.2d 187 (1998). The court of appeals concluded "computerized communication system" must be a "legislative term of art" because it was "unable to locate a definition for the term in any dictionaries or internet searches." McKellips, 361 Wis. 2d 773, ¶12. We are not convinced "computerized communication system" is a special or technical term. Rather, it is three commonly understood words used together. Although our dictionary does not specifically define the term "computerized communication system," it does define "computerized," "communication," and "system." Thus, we can examine the dictionary definitions of each of these three common words to ascertain their meaning when used together.

¶33 "Computerized" is defined as: "[o]f or relating to a computer or the use of a computer." Computerized, The American

22

Heritage Dictionary of the English Language 380 (5th ed. 2011). "Communication" is defined as: "[t]he act of communicating; transmission" "[t]he exchange of thoughts, messages, or information, as by speech, signals, writing, or behavior." Communication, The American Heritage Dictionary of the English Language 373 (5th ed. 2011). "System" is defined as: "A group of interacting, interrelated, or interdependent elements forming a complex whole." System, The American Heritage Dictionary of the English Language 1768 (5th ed. 2011).

¶34 Putting the three definitions together gives us the meaning of "computerized communication system": A group of interacting, interrelated, or interdependent elements forming a complex whole used to exchange thoughts or messages through a computer. Using this definition, we turn to whether McKellips' use of his flip-style phone to exchange texts with C.H.'s

cellphone satisfies the use of a "computerized communication system" element of Wis. Stat. § 948.075(1r).[5]

¶35 There is no doubt that modern cellphones today are in fact computers. See United States v. Flores-Lopez, 670 F.3d 803, 804-05 (7th Cir. 2012)("a modern cell phone is a computer"). This is true because modern cellphones contain technology enabling them to perform functions that a traditional computer does, including accessing the internet, sending and receiving email, using social media, word processing, gaming, storing pictures, and connecting to a printer. McKellips does not contest this point. Rather, he contends that the flip-style

---

[5] The court of appeals, in attempting to define "computerized communication system" discusses Wis. Stat. § 948.0125 and § 48.825, which are the two other statutes where that term appears. See McKellips, 361 Wis. 2d 773, ¶¶11-16. Although neither statute gives a definition of the term, some examples of a computerized communication system are provided: Section 948.0125 uses the term 13 times. Twelve times it refers to "messages sent 'on an electronic mail or other computerized communication system.'" McKellips, 361 Wis. 2d 773, ¶13 (citing § 947.0125(2)(a)-(f), (3)(a)-(f)). The thirteenth time "refers to messages sent 'from any computer terminal or other device that is used to send messages on an electronic mail or other computerized communication system.'" McKellips, 361 Wis. 2d 773, ¶13 (citing § 947.0125(3)(g)). Section 48.825 refers to communications 'by any computerized communication system, including by electronic mail, Internet site, Internet account, or any similar medium of communication provided via the Internet.'" McKellips, 361 Wis. 2d 773, ¶15. None of the examples in these statutes alters our conclusion that the cellphone here was used as a computer to communicate through a computerized cellular phone system in violation of Wis. Stat. § 948.075. Rather, these statutes support our conclusion that the legislature included the term "computerized communication system" to cover situations beyond the internet or email.

24

cellphone involved here is not computerized because the text messages did not use the internet.

¶36 Although the flip-style cellphone involved here may not be as advanced as some modern cellphones, McKellips' use of it satisfied the definition of computerized. The State's cellphone expert, Ryan Kaiser, provided uncontroverted testimony that the flip-style cellphone met the definition of computer. He also testified that the cellphone had logical functions including "computing the data you are typing into it" and when you pushed buttons, information was sent through the device creating images on the screen. These functions satisfy the definition of "computerized." After all, this is one of the basic functions of a computer: pushing buttons on a keypad or keyboard that sends messages through the processor, which results in numbers, letters, and words appearing on a screen. Additionally, Kaiser testified that all cellphone carriers are connected to a server and use a computer system or network, particularly when sending text messages. Thus, the first part of "computerized communication system" is met.

¶37 The middle word in this term, communication, does not appear to be disputed. Certainly texts and picture messages constitute communication. Both involve an exchange of messages by writing or image to another person. McKellips admits that he communicated with C.H. via text messages. Although he denied asking for or downloading the picture messages C.H. sent, there is evidence in the record documenting such activity. In any event, McKellips admits exchanging texts with C.H.

25

¶38 The final word in the term, system, was also met because the cellphones used a system to complete the communication. Again, Kaiser explained that all cellphone carriers are connected to a server and use a computer system or computer network, especially when sending text messages. We conclude that McKellips' texts using his flip-style cellphone satisfied the use of a "computerized communication system" element of Wis. Stat. § 948.075(1r). McKellips used his cellphone as a computer to send communications to the victim over the computer system used by their cellphones so that he could have sexual contact with her. Although case law on this issue is still developing, at least one appellate court has reached the same conclusion. See People v. Holmes, 956 N.Y.S.2d 365, 367 (N.Y. App. Div. 2012)(sending telephone text messages is not simply the use of a telephone, "but rather a telephone [that is] inextricably linked to a sophisticated computerized communication system").

¶39 We reject McKellips' position that this statute requires use of the internet for conduct to satisfy "computerized communication system." Although using the internet to communicate with a person who the actor believes or has reason to believe is not 16 years old with the intent of having sexual contact or intercourse certainly violates this

statute,[6] neither the statute, nor the definition of computerized communication system requires the use of the internet. If the legislature had intended to limit this statute to conduct involving the internet, it certainly could have done so. See Heritage Farms, Inc. v. Markel Ins. Co., 2009 WI 27, ¶¶14-15, 316 Wis. 2d 47, 762 N.W.2d 652 (where the legislature does not limit the application of a statute, we will not insert words into a statute to create such a result). By not specifically limiting this statute to internet uses, the legislature left open for prosecution the use of all computerized communication systems, including, as we have seen here, texts between cellphones.

B. Constitutionality of Wis. Stat. § 948.075

¶40 McKellips next argues that Wis. Stat. § 948.075 is unconstitutionally vague. His argument is not well-developed and is unconvincing.

¶41 A statute is unconstitutionally vague if it fails to give fair notice to a person of ordinary intelligence regarding what it prohibits and if it fails to provide an objective standard for enforcement. See State v. Pittman, 174 Wis. 2d 255, 276, 496 N.W.2d 74 (1993). The law does not require "'the line between lawful and unlawful conduct be drawn with absolute clarity and precision.'" State v. Colton M., 2015 WI App 94,

---

[6] See State v. Olson, 2008 WI App 171, ¶1, 314 Wis. 2d 630, 762 N.W.2d 393 (defendant use of online chat room); State v. Schulpius, 2006 WI App 263, ¶2, 298 Wis. 2d 155, 726 N.W.2d 706 (defendant had computer conversations over the internet).

27

¶7, 366 Wis. 2d 119, 875 N.W.2d 642 (citation omitted). "[A] statute need not be so specific as to delineate each and every mode of conduct embraced by its terms[.]" State v. Killory, 73 Wis. 2d 400, 405-06, 243 N.W.2d 475 (1976). "'A fair degree of definiteness is all that is required.'" Colton M., 366 Wis. 2d 119, ¶7 (citation omitted). We presume statutes are constitutional, look for reasons to uphold the constitutionality of a statute, and place the burden on the defendant to prove beyond a reasonable doubt that a statute is unconstitutional. See Aicher, 237 Wis. 2d 99, ¶¶18-19.

¶42 McKellips has not satisfied this burden. "Computerized communication system" is sufficiently definite in meaning based on each word's common usage and ordinary understanding to satisfy fair notice requirements. See Killory, 73 Wis. 2d at 407. A person of ordinary intelligence need not guess at what this term means, but instead needs to simply consider the common meaning of each word in the term. Such consideration provides fair notice that using a cellphone to text a child in order to entice a sexual relationship violates the statute. McKellips' argument that the term does not give fair notice because he really did not have the intent required by the statute is not a constitutional argument, but a sufficiency of the evidence argument——an argument that was rejected by a jury that listened to all the testimony and considered all the evidence.

¶43 McKellips also argues that the statute is so vague it could result in prosecutions of innocent people who are using

28

cellphones in everyday life and extend beyond the use of cellphones entirely to encompass mailing letters through the post office. McKellips' argument is meritless. The statute clearly does not criminalize ordinary use of a cellphone. In addition to the use of a computerized communication system discussed in this opinion, conviction under Wis. Stat. § 948.075 also requires proof of the actor's "intent to have sexual contact or sexual intercourse" and "[p]roof that the actor did an act, other than use a computerized communication system to communicate with the individual, to effect the actor's intent under sub. (1r) . . . to prove that intent." See § 948.075(1r), (3). It is absurd to suggest that a person of ordinary intelligence would not read the language of § 948.075 as fair notice that using a cellphone to send text messages to lure a child into sexual activity is against the law.

¶44 Our legislature, for good reason, has taken a strong stance in favor of protecting children from sex crimes. See Wis. Stat. ch. 948 (Crimes against children). "The state has the right to enact reasonable legislation to protect the safety and well-being of minors." Killory, 73 Wis. 2d at 407. Mindful of the need to protect children in a world of exponential technological advancement, the legislature chose an expansive term——"computerized communication system"——to protect children from falling prey to criminals taking advantage of rapidly changing technology before new laws can be passed. The legislature employed a term that would provide fair notice, but also encompasses future technologies. It selected "computerized

29

communication system," which as explained here, is readily understandable by a person of ordinary intelligence. Because this term satisfies the fair notice aspect of the test it does not render Wis. Stat. § 948.075 unconstitutionally vague on that basis.

¶45 McKellips also fails to convince us that the statute does not provide an objective standard of enforcement. The standard of enforcement within the plain language of the statute clearly states the elements required to prove the crime. McKellips makes much ado about the term "computerized communication system" not being capable of objective enforcement because it is not defined. The absence of a definition does not make the statute incapable of objective enforcement. As already explained, the term "computerized communication system" is readily understandable. A search of our case law revealed ten other cases (besides McKellips') involving "computerized communication system"——none of which had any problems understanding or applying that term. See, e.g. State v. Olson, 2008 WI App 171, ¶1, 314 Wis. 2d 630, 762 N.W.2d 393; State v. Schulpius, 2006 WI App 263, ¶2, 298 Wis. 2d 155, 726 N.W.2d 706. The court of appeals' opinion in this case appears to stand alone as the only court that struggled with this terminology, likely because this case involved text messages between flip-style cellphones rather than the internet or email. As we have explained, the text messages satisfied the element "use[ of] a computerized communication system." This terminology provides a clear and objective standard for enforcement. Anyone who (1)

30

uses a computerized communication system for purposes of text messaging between cellphones to communicate with "an individual who the actor believes or has reason to believe" is not yet 16 years old and "with intent to have sexual contact or sexual intercourse" and (2) commits "an act, other than use of a computerized communication system . . . to effect the actor's intent," can be prosecuted under this statute. McKellips has not proven beyond a reasonable doubt that Wis. Stat. § 948.075 is unconstitutionally vague. We reject his constitutional challenge.

## C. Jury Instruction

¶46 McKellips next argues the jury instruction on Wis. Stat. § 948.075(1r), which asked the jury to determine whether his cellphone itself was a computerized communication system was misleading and not harmless. We do not agree.

¶47 The State points out that McKellips did not object to these instructions at trial or in his appeal to the court of appeals. Rather, the jury instruction issue was raised sua sponte by the court of appeals. Failure to contemporaneously object to jury instructions results in forfeiting review of the jury instructions. State v. Cockrell, 2007 WI App 217, ¶36, 306 Wis. 2d 52, 741 N.W.2d 267. Wisconsin Stat. § 805.13(3) governs jury instructions and requires contemporaneous objections be made in the circuit court. The purpose of the rule is to give the opposing party and the circuit court an opportunity to correct any error. Cockrell, 306 Wis. 2d 52, ¶36. This also helps preserve jury verdicts and conserve judicial resources.

31

Despite McKellips' forfeiture, however, we choose to address this because the court of appeals based its entire reversal decision on the jury instruction, which prompted us to ask for briefing on the issue. See McKellips, 361 Wis. 2d 773, ¶¶20-21; see also D.L. Anderson's Lakeside Leisure Co., Inc. v. Anderson, 2008 WI 126, ¶41, 314 Wis. 2d 560, 757 N.W.2d 803 (we may address a forfeited issue at our discretion when we deem it important).

¶48 McKellips concedes that Wis. JI—Criminal 2135 is an accurate statement of the law[7] but objects to the extra instructions the circuit court tacked on to the end of Wis JI-Criminal 2135 telling the jury it "must determine whether the phone described in the evidence constitutes a computerized communication system" and then instructing it on the definition of computer.

¶49 We agree with McKellips that the circuit court's instruction advising the jury it must determine whether the phone itself constituted a computerized communication system could have been more precisely worded. The jury could have been instructed to find whether the phone is a computerized device

---

[7] We acknowledge the amicus brief filed on behalf of the Wisconsin Association of Criminal Defense Lawyers (WACDL) alerting us to a potential flaw in Wis. JI-Criminal 2135. It points out that the instruction's omission of the qualifying "in violation of s. 948.02(1) or (2)," could create an issue when the person being communicated with is an adult posing as a child. Our analysis in this case does not impact this issue and therefore we do not address it. We encourage WACDL to raise this issue with the Criminal Jury Instructions Committee.

32

that was used to communicate through a computerized cellphone network or system to entice the sexual contact with C.H. We do not agree, however, that the circuit court's phrasing rendered the jury instructions as a whole erroneous. As noted, the circuit court correctly stated the four elements of the crime and informed the jury it must find each element beyond a reasonable doubt. This included instructing the jury repeatedly it must find that McKellips "used" a computerized communication system. See supra ¶27. In addition, the definition of computer given in the instruction was an accurate statement of the law and undoubtedly led the jury to conclude the cellphone was the computer McKellips used to communicate through the system. The jury's finding that McKellips used his cellphone to communicate with C.H. necessarily means that his cellphone was used to access the system. Obviously, his cellphone was not the system itself——rather, the cellphone and the system were connected together because the communications from his cellphone to C.H.'s cellphone could not have occurred without the use of the system. Under these circumstances, we are not convinced that this isolated wording in the extra instruction rendered the jury instructions as a whole inaccurate.

¶50 Because the jury instructions accurately stated the law, they were not erroneous. Even if this court were to conclude the extra instruction were erroneous, reversal is not warranted because the extra instruction was not prejudicial. "An error is prejudicial if it probably [and not merely possibly] misled the jury." Kochanski v. Speedway SuperAmerica,

33

LLC, 2014 WI 72, ¶11, 356 Wis. 2d 1, 850 N.W.2d 160 (citation omitted). Jury instruction error is harmless when it did not contribute to the verdict. See State v. Harvey, 2002 WI 93, ¶48, 254 Wis. 2d 442, 647 N.W.2d 189. Any error here did not probably mislead the jury and the verdict would not have changed if the extra instruction had been re-worded. The elements of the crime were clearly stated and the evidence in the record sufficiently supported each element. Cellphone expert Kaiser's testimony was uncontroverted that the cellphone was a computer and that the exchange of text messages used a computerized system to complete the communication. Thus, the circuit court's phrasing in the extra instruction, if erroneous at all, was harmless error.

### D. Wisconsin Stat. § 752.35

¶51 The last issue we address is whether the court of appeals erred in exercising its discretionary reversal authority under Wis. Stat. § 752.35, when it determined the interest of justice required a new trial on the ground that the real controversy was not fully tried. We have already concluded that the wording used in the extra jury instruction did not result in reversible error. Because this was the sole basis for the court of appeals' discretionary reversal, we must conclude it erred. The real controversy in this case with respect to Wis. Stat. § 948.075(1r) was whether McKellips used a computerized communication system with the intent to have sexual contact with C.H. As seen from the detailed facts set forth in part I., that

34

issue was fully tried and thus, justice requires that the jury verdict stand.

¶52 We make one final point with respect to Wis. Stat. § 752.35. We have consistently held that the discretionary reversal statute should be used only in exceptional cases. See Kucharski, 363 Wis. 2d 658, ¶¶23, 41; State v. Avery, 2013 WI 13, ¶38, 345 Wis. 2d 407, 826 N.W.2d 60; Vollmer v. Luety, 156 Wis. 2d 1, 11, 456 N.W.2d 797 (1990). In Kucharski, we emphasized that it is error to jump to § 752.35 as a shortcut. "In an exceptional case, after all other claims are weighed and determined to be unsuccessful, a reviewing court may determine that reversal is nevertheless appropriate under Wis. Stat. § 752.35." Kucharski, 363 Wis. 2d 658, ¶43 (emphasis added). In exercising discretionary reversal, the court of appeals must engage in "an analysis setting forth the reasons" that the case may be characterized as exceptional. Id., ¶42. Here, the court of appeals did not decide the issues McKellips raised, and took a shortcut directly to § 752.35. McKellips did not ask the court of appeals to reverse on the basis of § 752.35. Moreover, the court of appeals exercised discretionary reversal authority without even analyzing the exceptional standard. For these reasons, we conclude the court of appeals erred in reversing McKellips' conviction and ordering a new trial under § 752.35.

## IV. CONCLUSION

¶53 We hold the State satisfied its burden of proving the element, use of a "computerized communications system," because McKellips used his cellphone as a computer to send

35

communications to the victim over the computer system used by their cellphones so that he could have sexual contact with her. We also hold that Wis. Stat. § 948.075 is not unconstitutionally vague because a person of ordinary intelligence would understand that using a cellphone to text or picture message with a child to entice sexual encounters violates the statute; moreover, the statute is capable of objective enforcement. Further, we hold that the jury instruction given here, although not perfect, when read as a whole accurately stated the law. Even if the extra instruction were erroneous, it was harmless error. Finally, we hold that the court of appeals erred when it exercised its discretionary authority under Wis. Stat. § 752.35 to reverse McKellips' conviction. The real controversy was tried in this case; moreover, discretionary reversals under § 752.35 are limited to exceptional cases, and the court of appeals failed to analyze that criterion before reversing under § 752.35.

*By the Court.*—The decision of the court of appeals is reversed.[8]

¶54 DAVID T. PROSSER, J., did not participate.

---

[8] McKellips filed a document labeled as a petition for review of the denial of bail, while this case was pending, seeking release on cash bond based on the court of appeals' decision reversing his conviction and ordering a new trial. Because we have reversed the court of appeals, we are denying his request labeled as a petition for review on the bail matter in a separate order being issued today.

36

¶55 SHIRLEY S. ABRAHAMSON, J. *(dissenting).* The instant case concerns the interpretation of the phrase "computerized communication system" in Wis. Stat. § 948.075(1r) (2013-14)[1] and its application to Rory McKellips' exchange of phone calls, voicemails, and text messages with a minor, C.H.

¶56 McKellips was charged with repeated sexual assault of a child, exposing genitals or pubic area, obstructing an officer, and use of a "computerized communication system" to facilitate a child sex crime.

¶57 The jury acquitted McKellips of the sexual assault and exposure counts.[2] Even though the jury did not find McKellips guilty of a child sex crime, the jury found McKellips guilty of using a "computerized communication system" to facilitate a child sex crime. McKellips challenges this conviction in the instant case.[3]

---

[1] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

[2] Although McKellips was acquitted of these counts, and the alleged assaults and exposure are largely irrelevant to the issues in the instant case, the majority opinion recounts these allegations and the associated trial testimony in superfluously graphic detail. The sexual conduct alleged by C.H. is reprehensible. If the court were called upon to condemn such conduct, there would be immediate and unanimous condemnation.

Our task, however, is not to determine whether McKellips deserves to be punished for this alleged conduct. Rather, we are called upon to analyze and apply a statute relating to use of a computerized communication system.

[3] The jury found McKellips guilty of obstructing an officer. This conviction is not being challenged.

¶58 The statute defining this crime, Wis. Stat. § 948.075, provides (in relevant part) as follows:

(1r) Whoever uses a computerized communication system to communicate with an individual who the actor believes or has reason to believe has not attained the age of 16 years with intent to have sexual contact or sexual intercourse with the individual in violation of s. 948.02 (1) or (2) is guilty of a Class C felony.

. . . .

(3) Proof that the actor did an act, other than use a computerized communication system to communicate with the individual, to effect the actor's intent under sub. (1r) shall be necessary to prove that intent.

¶59 The phrase "computerized communication system" is not defined in this statute or in any other statute. I disagree with the majority's interpretation of this phrase.

¶60 I address two issues raised by McKellips:

I. He argues that Wis. Stat. § 948.075 is unconstitutionally vague because it does not provide fair warning of the conduct it prohibits or provide objective standards for the statute's enforcement. In other words, he asserts that the statute is void for vagueness. See State v. Popanz, 112 Wis. 2d 166, 172, 332 N.W.2d 750 (1983); see also Johnson v. United States, 135 S. Ct. 2551, 2556 (2015). I conclude that § 948.075 does not pass muster under this test in two respects:

A. The ambiguity of the phrase "computerized communication system," the minimal guidance provided by the statutes, and the need for expert testimony regarding the functioning of

2

various communication systems demonstrate that Wis. Stat. § 948.075 does not provide fair warning of what is prohibited to persons of ordinary intelligence.

B. The jury instruction regarding "computerized communication system" misstated the law. The erroneous instruction demonstrates that Wis. Stat. § 948.075 lacks objective enforcement standards.

II. After this court granted review in the instant case, McKellips requested (in a filing he characterized as either a petition for review or a motion) that this court release him from incarceration pending this review of the court of appeals' ruling in his favor. The issue of his release from incarceration is now moot given today's decision of this court. The issues McKellips raises, however, merit review.

The majority opinion (at n.8) denies the petition for review (or motion) in a footnote and a separate order. Neither provides any explanation. Although this issue is moot, I would have had the court address it.

¶61 Accordingly, I would affirm the decision of the court of appeals reversing the judgment of conviction, although on different grounds than those relied upon by the court of appeals.

3

¶62 Therefore, I dissent and write separately.

I

¶63 The majority opinion concludes that Wis. Stat. § 948.075 is not void for vagueness because the phrase "computerized communication system" is "readily understandable by a person of ordinary intelligence" and "capable of objective enforcement."[4]

¶64 General principles underlying the void for vagueness doctrine put the instant case into legal focus.

¶65 The United States Supreme Court has explained the doctrine as follows: "The prohibition on vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due process.'"[5]

¶66 The Court has further stated: "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids."[6]

---

[4] See majority op., ¶¶44-45.

[5] Johnson v. United States, 135 S. Ct. 2551, 2557 (2015) (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)).

[6] Lanzetta v. New Jersey, 306 U.S. 451, 453 (1939).

¶67 Although "[t]here is no simple litmus-paper test to determine whether a criminal statute is void for vagueness,"[7] a statute may be void for vagueness if it does not (1) "give a person of ordinary intelligence who seeks to avoid its penalties fair notice of conduct required or prohibited";[8] or (2) "provide standards for those who enforce the laws and those who adjudicate guilt."[9]

---

[7] State v. Popanz, 112 Wis. 2d 166, 172, 332 N.W.2d 750 (1983); see also 1 Wayne R. LaFave, Substantive Criminal Law, § 2.3(a), at 146 (2003) ("[T]here is no simple litmus-paper test for determining whether a criminal statute is void for vagueness.").

[8] Popanz, 112 Wis. 2d at 173; see also Johnson, 135 S. Ct. at 2556; Grayned v. City of Rockford, 408 U.S. 104, 108 (1972) ("Vague laws may trap the innocent by not providing fair warning.").

[9] See Popanz, 112 Wis. 2d at 173 ("A statute should be sufficiently definite to allow law enforcement officers, judges, and juries to apply the terms of the law objectively to a defendant's conduct in order to determine guilt without having to create or apply their own standards.") (citing State v. Courtney, 74 Wis. 2d 705, 711, 247 N.W.2d 714 (1976)); see also Johnson, 135 S. Ct. at 2556 (stating that due process is violated when the government "tak[es] away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.") (citing Kolender v. Lawson, 461 U.S. 352, 357-58 (1983)). In addition to these two principles, Professor LaFave identifies a third principle not at issue in the instant case: Whether the law provides sufficient space for the exercise of First Amendment rights. See 1 LaFave, supra note 7, § 2.3(a), at 146. This court has recognized this limitation on vague criminal laws as well. See City of Madison v. Baumann, 162 Wis. 2d 660, 672-74, 470 N.W.2d 296 (1991) (stating, in a vagueness challenge to a noise ordinance on First Amendment grounds, that "we look to the face of the ordinance to guard against the possibility that a vague prohibition may deter or give pause to socially desirable conduct or expression").

(continued)

¶68 This latter prong has been characterized as "the more important aspect of [the] vagueness doctrine,"[10] and is implicated when, among other things, "the law [is] so unclear that a trial court cannot properly instruct the jury."[11]

¶69 The United States Supreme Court summarized the rationale of the void for vagueness doctrine in Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972):

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws

---

For further discussions of the void for vagueness doctrine, see, for example, 1 LaFave, supra note 7, § 2.3(a)-(d), at 144-53; 1A Sutherland Statutory Construction § 21:16, at 197-241 (Norman J. Singer & J.D. Shambie Singer eds., 7th ed. 2009); Ryan McCarl, Incoherent and Indefensible: An Interdisciplinary Critique of the Supreme Court's "Void-For-Vagueness" Doctrine, 42 Hastings Const. L.Q. 73, 74 (2014) (critiquing the void for vagueness doctrine as "a confusing conceptual thicket."); Orin S. Kerr, Vagueness Challenges to the Computer Fraud and Abuse Act, 94 Minn. L. Rev. 1561, 1562, 1571-75 (2010) (describing the void for vagueness doctrine in general and noting that the Computer Fraud and Abuse Act "has become so broad, and computers so common, that expansive or uncertain interpretations" of certain statutory language "will render it unconstitutional."); John F. Decker, Addressing Vagueness, Ambiguity, and Other Uncertainty in American Criminal Laws, 80 Denv. U. L. Rev. 241, 248-60 (2002) (sketching the contours of the two principles of the void for vagueness doctrine).

[10] Kolender v. Lawson, 461 U.S. 352, 358 (1983) (quoting Smith v. Goguen, 415 U.S. 566, 575 (1974)) (internal alteration omitted).

[11] 1 LaFave, supra note 7, § 2.3(c), at 150-51; see also Popanz, 112 Wis. 2d at 173.

must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications (footnotes omitted).

¶70 These important values are implicated in the instant case.

¶71 Without further legislative elucidation, the phrase "computerized communication system" in Wis. Stat. § 948.075 does not provide fair notice of the conduct it prohibits. Perhaps the truth of this statement is best illuminated by the fact that both the defendant and the State took varying positions on the meaning of the phrase over the course of this case.

¶72 The majority opinion attempts to provide a definition of "computerized communication system" by referring to the dictionary.

¶73 The majority's "plain meaning" approach entails locating the dictionary definitions of the three little words—"computerized," "communication," and "system"[12]—asserting that "'computerized communication system' is [not] a special or technical term."[13]

¶74 Thus, the majority opinion examines not only the phrase "computerized communication system" in isolation, but

---

[12] Majority op., ¶33.

[13] Majority op., ¶32; see also majority op. ¶34. Using the dictionary definitions, the majority concludes that a "computerized communication system" is "[a] group of interacting, interrelated, or interdependent elements forming a complex whole used to exchange thoughts or messages through a computer."

7

also examines each word in isolation, before combining the separate dictionary definitions of each word into a single "plain meaning" of the phrase "computerized communication system." Majority op., ¶¶33-34.

¶75 The majority opinion's efforts at defining these "three little words"——"computerized communication system"——in isolation defy common English usage and common sense. Sometimes "no other words can tell it half so clearly" as an entire phrase.[14]

¶76 Take, for example, the phrases "smart phone," "local area network," "chat room," or "hard drive," all phrases used in discussing technology. Defining each word in these phrases separately yields a definition that gives little or no insight into what the phrase——the words taken together——actually means.

¶77 I do not agree with the majority opinion that a commonly understood, "plain" meaning of the phrase "computerized communication system" exists. I agree with the court of appeals that the text and context of Wis. Stat. § 948.075 demonstrate that the phrase "computerized communication system" has a

---

[14] See Sarah Vaughan, Three Little Words, on Live at the London House (Mercury Records 1958).

particular meaning in the statutes.[15] A court gives such terms their "technical or special definitional meaning . . . ."[16]

¶78 I further disagree with the majority opinion's failure to read Wis. Stat. § 948.075 in context. When interpreting a statute, a court looks to the context in which statutory language is used, "'not . . . at a single, isolated sentence or portion of a sentence' . . . ."[17]

¶79 I would read this statute in context with two other statutes, Wis. Stat. §§ 947.0125 and 48.825, both of which use the phrase "computerized communication system." The parties agreed in the court of appeals that the phrase "computerized communication system" has the same meaning in all the statutes in which the legislature uses the phrase. See State v. McKellips, 2015 WI App 31, ¶12, 361 Wis. 2d 773, 864 N.W.2d 106.

¶80 These statutes use the phrase "computerized communication system" as a term of art, with a particular definition illuminated (albeit hazily) by their language and context.

---

[15] See State v. McKellips, 2015 WI App 31, ¶12, 361 Wis. 2d 773, 864 N.W.2d 106.

[16] Bruno v. Milwaukee Cnty., 2003 WI 28, ¶20, 260 Wis. 2d 633, 660 N.W.2d 656 (citing Weber v. Town of Saukville, 209 Wis. 2d 214, ¶15, 562 N.W.2d 412 (1997)); see also Wis. Stat. § 990.01(1) ("All words and phrases shall be construed according to common and approved usage, but technical words and phrases and others that have a peculiar meaning in the law shall be construed according to such meaning.").

[17] Hubbard v. Messer, 2003 WI 145, ¶9, 267 Wis. 2d 92, 673 N.W.2d 676 (quoting Landis v. Phys. Ins. Co. of Wis., Inc., 2001 WI 86, ¶16, 245 Wis. 2d 1, 628 N.W.2d 893).

9

¶81 First, Wis. Stat. § 947.0125, entitled "Unlawful use of computerized communication systems" and enacted before the statute at issue in the instant case, provides (among other things) that any person who "[k]nowingly permits or directs another person to send a message prohibited by this section from any computer terminal or other device that is used to send messages on an electronic mail or other computerized communication system and that is under his or her control" is subject to a Class B forfeiture.[18]

¶82 As the court of appeals reasoned,

> Wis. Stat. § 947.0125 informs the definition of "computerized communication system" in two ways. First, we know that one example of using such a system is sending email messages. Second, paragraph (3)(g) informs us that a computer or other device, i.e., hardware, cannot itself constitute a computerized communication system because that paragraph distinguishes the two.[19]

¶83 Second, Wis. Stat. § 48.825 also uses the phrase "computerized communication system" without defining it. This statute prohibits certain kinds of advertising for purposes of adoption.[20]

¶84 Section 48.825(1)(a) defines "advertise" to mean "to communicate by any public medium that originates within this state, including by newspaper, periodical, telephone book

---

[18] Wis. Stat. § 947.0125(3)(g).

[19] McKellips, 361 Wis. 2d 773, ¶14.

[20] This statute was enacted after Wis. Stat. § 948.075 took effect.

listing, outdoor advertising sign, radio, or television, or by any computerized communication system, including by electronic mail, Internet site, Internet account, or any similar medium of communication provided via the Internet."

¶85 In Wis. Stat. § 48.825(1)(c), "Internet account" is defined as "an account created within a bounded system established by an Internet-based service that requires a user to input or store access information in an electronic device in order to view, create, use, or edit the user's account information, profile, display, communications, or stored data."

¶86 As the court of appeals explains, Wis. Stat. §§ 48.825 and 947.0125 inform the definition of "computerized communication system" in two similar ways:

> First, we know that use of such a system includes all of the examples and the category listed in the statute. Second, because [§ 48.825](1)(c) distinguishes between the "internet account" example of computerized communication system and the "electronic device" used to access it, we know that the device itself cannot constitute such a system.[21]

¶87 In sum, I agree with the court of appeals that, based on the ways in which the legislature has used the phrase "computerized communication system," the phrase "is a legislative term of art . . . ."[22]

A

¶88 Aside from telling us (1) that e-mail is an example of a computerized communication system; and (2) that a

---

[21] McKellips, 361 Wis. 2d 773, ¶16 (footnote omitted).

[22] See McKellips, 361 Wis. 2d 773, ¶12.

"computerized communication system" cannot be hardware or a device, the statutes and case law contain nothing that provides additional clarity as to what constitutes a "computerized communication system" in Wis. Stat. § 948.075.[23]

¶89 As the State acknowledged at oral argument, expert testimony was necessary in the instant case to establish that the defendant's use of a cellphone constituted use of a "computerized communication system."

¶90 Although expert testimony is often admitted in criminal cases and can aid the jury in applying the law on which it is instructed, the need for expert testimony in the instant case (and other cases under Wis. Stat. § 948.075) demonstrates the lack of fair warning provided by the statute.

¶91 The following two exchanges from oral argument illustrate the problem. The first exchange was with me:

> Justice Abrahamson: Suppose they just use voicemail? Does that fit within the statute?
>
> Assistant Attorney General: I think it probably does.
>
> Justice Abrahamson: Well, it either does or it doesn't. Why do you say "probably"?
>
> AAG: Well, because I don't have the facts here and I don't have an expert testifying as to how that works with voicemail.

---

[23] The court of appeals concluded, "While we have not derived a complete definition of the term 'computerized communication system,' we have discerned examples or categories that clearly do or do not constitute such a system." See McKellips, 361 Wis. 2d 773, ¶17.

¶92 Later, a similar exchange occurred with Justice Gableman:

> Justice Gableman: It seems to me that when I read the briefs, it seems to me the state is asking us to assume a number of things. You [stated previously] well maybe there's someplace that still uses a switchboard. I have no idea how the telephone company works . . . . Aren't you asking us to assume an awful lot? Assume that by using a TracFone to call another person that that device has become transformed into a computer? Let's start with that.
>
> AAG: No. Well, I mean, I am because that was what the expert testified to. . . . If we were talking about a land phone like that then there would be an expert saying it's a phone like this and then the jury would say well that's not . . . .
>
> Justice Gableman: So say he used the phone. Say there are no text messages, say there are no photographs and . . . it was solely by voice by a call and it was solely a verbal communication . . . . Is that the facilitation of a sex crime by use of a computerized communication system?
>
> AAG: Well and there's another overt act, perhaps . . . . It could be perhaps, but you have to have presumably an expert testifying that there is some computer involved in that computerized communication system. . . .

¶93 These exchanges expose the failure of Wis. Stat. § 948.075 to provide fair notice to persons of ordinary intelligence of the prohibited conduct. If expert testimony regarding the internal functioning of a land line telephone (for example) is necessary to determine whether its use constitutes a "computerized communication system," then how does Wis. Stat. § 948.075 "give [a] person of ordinary intelligence a reasonable

opportunity to know what is prohibited, so that he may act accordingly?"[24]

¶94 Persons of ordinary intelligence have no idea how cellular phones (or land line phones) function. Likewise, persons of ordinary intelligence do not know whether the various uses of TracFones in the instant case constitute use of a "computerized communication system."

¶95 Wisconsin Stat. § 948.075 is not "addressed to those in a particular trade or business" in which the "terms used have a meaning well enough defined to enable one engaged in that trade or business to apply it correctly."[25]

¶96 Rather, Wis. Stat. § 948.075 is generally applicable, and ordinary persons in the public do not know whether by using a particular device in a particular manner, they may be using a "computerized communication system."

¶97 As the court of appeals recognized in Town of East Troy v. Town & Country Waste Service, Inc., 159 Wis. 2d 694, 707, 465 N.W.2d 510 (Ct. App. 1990), when the meaning of a

---

[24] See Grayned, 408 U.S. at 108; see also United States v. Williams, 553 U.S. 285, 304 (2008) (describing a vague statute as one which fails "to provide a person of ordinary intelligence fair notice of what is prohibited . . . .") (emphasis added).

[25] See 1 LaFave, supra note 7, § 2.3(b), at 147 & n.29 (citing Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982) (noting that the void for vagueness test is less strict in the context of economic regulation because businesses can be expected to consult regulation in advance); Hygrade Provision Co. v. Sherman, 266 U.S. 497, 501-02 (1925) (noting that "the term 'kosher' has a meaning well enough defined to enable one engaged in the trade to correctly apply it, at least as a general thing.")).

statute varies from case to case based on expert testimony, "it raises serious constitutional vagueness questions."

¶98 The State's argument in the instant case raises the same problems. If, as the State contends, expert testimony is necessary to know whether Wis. Stat. § 948.075 applies, then Wis. Stat. § 948.075 does not give fair warning of the conduct it prohibits.

B

¶99 I now consider the jury instructions in the context of whether Wis. Stat. § 948.075 provides objective enforcement standards. In reversing the judgment of conviction in the instant case, the court of appeals examined the circuit court's jury instructions regarding Wis. Stat. § 948.075. The question is whether Wis. Stat. § 948.075 is "so unclear that a trial court cannot properly instruct the jury"[26] and therefore unconstitutionally vague.

¶100 In the instant case, the circuit court correctly instructed the jury by reciting the elements of Wis. Stat. § 948.075. Then the circuit court apparently attempted to explain what the statutory phrase "computerized communication system" means.

¶101 The circuit court stated as follows:

Evidence has been received that the defendant communicated with a child under the age of 16 via a mobile or cellphone. You must determine whether the

---

[26] 1 LaFave, supra note 7, § 2.3(c), at 151.

15

phone described in the evidence constitutes a computerized communication system.

To aid you in that determination, you are instructed that under Wisconsin law, a computer is defined as—computer is defined as computer, which means an electronic device that performs logical, arithmetic, and memory functions by manipulating electronic or magnetic impulses, and includes all input, output, processing, storage, computer software and communication facilities that are connected or related to a computer in a computer system or computer network. Computer system is defined as a set of related computer equipment, hardware, or software.

¶102 This instruction took the suggestion of Wis JI——Criminal 2135, a pattern jury instruction, that other statutory definitions may illuminate the meaning of the undefined phrase "computerized communication system."

¶103 The circuit court borrowed definitions for "computer" and "computer system" from another statute that defined these words explicitly for purposes of that section of the statutes. See Wis. Stat. § 943.70(1)(am), (e).

¶104 Note 3 to the pattern instruction states: "'Computerized communication system' is not defined in § 948.075. Section 943.70, Computer crimes, provides definitions of 'computer,' and 'computer system.' See § 943.70(1)(am) and (e)."

¶105 Thus, the instruction the jury received defined only the words "computer" and "computer system."

¶106 There are problems with this approach.

¶107 First, the legislature explicitly stated in Wis. Stat. § 943.70 that the definitions of "computer" and "computer system" apply "[i]n this section," i.e., in § 943.70. The

16

legislature did not state that these definitions apply to any or all other sections or chapters of the statutes. Indeed, the legislature made it very clear it was limiting these definitions to § 943.70.

¶108 Second, neither of these definitions actually mirrors the text of Wis. Stat. § 948.075. Section 948.075 refers to a "computerized communication system." Instructing the jury on what a "computer" or "computer system" is does not illuminate what a "computerized communication system" is. Rather, such instructions might be confusing to the jury. They seem to have confused the circuit court and attorneys at trial.

¶109 The definition of "computer" in Wis. Stat. § 943.70(1)(am) refers to "an electronic device." The State and the court of appeals agree, however, that the circuit court misspoke when it told the jury to determine whether the cellphone described in the evidence constitutes a computerized communication system.[27] The system and the device are different. According to the State, the device is used to access a computerized communication system.

¶110 Likewise, the definition of "computer system" in Wis. Stat. § 943.70(1)(e) may have confused the jury. The phrase "computerized communication system" refers to a "communication system," not a "computer system." Moreover, as the State argued, a computer (or other similar device) is used to access a

---

[27] See McKellips, 361 Wis. 2d 773, ¶21.

17

computerized communication system. Thus, the jury might again be confused by the addition of this definition.

¶111 In sum, without the addition of these two (largely irrelevant and potentially confusing) definitions from other statutes, and the circuit court's erroneous comment that the jury was to "determine whether the phone described in the evidence constitutes a computerized communication system," the jury would have been left with only the words "computerized communication system" as guidance in applying Wis. Stat. § 948.075 to the facts of the instant case.

¶112 Provided with a legislative term of art and no means of defining it, the jury is then left to decide "without any legally fixed standards, what is prohibited and what is not in each particular case."[28] This would permit an unconstitutional, "'standardless sweep that allows . . . juries to pursue their personal predilections.'"[29]

¶113 As a result, I conclude that Wis. Stat. § 948.075 is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, [and] so standardless that it invites arbitrary enforcement."[30]

¶114 Accordingly, I conclude that Wis. Stat. § 948.075 is unconstitutional.

---

[28] 1 LaFave, supra note 7, § 2.3(c), at 151; see also (internal alteration omitted); Popanz, 112 Wis. 2d at 173.

[29] Kolender, 461 U.S. at 358 (quoting Smith, 415 U.S. at 575).

[30] See Johnson, 135 S. Ct. at 2556.

18

II

¶115 After this court granted the State's petition for review of the court of appeals' decision overturning McKellips' conviction, McKellips filed a motion in circuit court for release on bail pending review in this court.

¶116 It appears from McKellips' filing in this court that the parties were unsure about how to proceed following the court of appeals' decision and this court's decision to grant review. There were also concerns over whether the circuit court had "subject matter jurisdiction" or "competency to proceed."

¶117 McKellips sent a letter to the Clerk of the Supreme Court seeking guidance in this matter. The Clerk advised that she does not provide such guidance.

¶118 The circuit court then denied McKellips' motion for release on bail.

¶119 McKellips subsequently filed a motion in the court of appeals seeking that court's review of the circuit court's denial of his request for release on bail. The court of appeals dismissed the motion with the following explanation: "Because this appeal is currently pending in the Wisconsin Supreme Court, the motion should be filed in that court."

¶120 McKellips then sought relief in this court.

¶121 A member of the court refused to allow a discussion of this matter at oral argument.[31] Thus McKellips was incarcerated

---

[31] Oral argument in the instant case took place on April 7, 2016, and is available online through Wisconsin Eye at http://www.wiseye.org/Video-Archive/Event-Detail/evhdid/10498.

until this court reached a decision on the merits of the instant case. "[A]ny deprivation of liberty is a serious matter." Argersinger v. Hamlin, 407 U.S. 25, 41 (1972) (Burger, C.J., concurring).

¶122 McKellips' filing raises legal questions about the procedure to be followed in circuit courts, the court of appeals, and this court when release on bail is requested following the reversal of a conviction by the court of appeals.

¶123 These questions do not appear to be definitively resolved in the statutes or case law. They include the interpretation and application of Wis. Stat. §§ 809.31 and 969.01; State v. Whitty, 86 Wis. 2d 380, 398, 272 N.W.2d 842 (1978); and Rohl v. State, 90 Wis. 2d 18, 279 N.W.2d 731 (Ct. App. 1979). Moreover, these issues are likely to recur yet may, with the passage of time or subsequent events, become moot. I would have the court address them.

¶124 I attempted to start a discussion about these issues with the parties at oral argument, to no avail. Now, the majority opinion denies the petition for review/motion without explanation. I disagree with the way the court has managed this matter.

¶125 For the reasons set forth, I dissent and write separately.

¶126 I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

20