**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**August 20, 2019**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP948-CR**

Cir. Ct. No. **2016CF898**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT III**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

SEAN N. JONES,

    DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Eau Claire County: MICHAEL A. SCHUMACHER, Judge. *Affirmed in part; reversed in part and cause remanded with directions*.

Before Stark, P.J., Hruz and Seidl, JJ.

¶1    HRUZ, J.  Sean Jones appeals a judgment of conviction for armed robbery as a party to the crime, as well as an order denying his motion for postconviction relief.  Jones asserts there was insufficient evidence to support the

jury's finding that Jones knew his accomplice was armed with a firearm during the commission of the offense. Additionally, Jones argues the real controversy was not fully tried because the circuit court failed to give certain jury instructions, including the instruction for the lesser-included offense of simple robbery, and because it admitted certain improper identification evidence, including evidence of Jones's nickname, "Sneak." Finally, Jones challenges certain aspects of his sentence. He contends the court failed to explain how the specific length of Jones's initial confinement advanced the articulated sentencing objectives, and that it also failed to award 204 days' sentence credit for the time Jones was in custody between his arrest and his sentencing after revocation of a probationary term imposed in earlier cases.

¶2　　We reject Jones's challenges to his conviction and to the circuit court's exercise of its sentencing discretion, but we conclude Jones is entitled to the sentence credit he seeks. To explain, we conclude the jury could reasonably infer from the circumstances of the robbery that Jones knew his accomplice was armed with a firearm. We also conclude Jones is not entitled to a new trial in the interest of justice based upon either the court's failure to give certain jury instructions or the court's evidentiary decisions. We further reject Jones's challenge to the court's exercise of its sentencing discretion because the court provided the required explanation for the general range of the sentence imposed. However, because Jones was held in custody on a probation hold as a result of the armed robbery, he is entitled to sentence credit for the time he spent confined between his arrest and his sentencing after revocation. Accordingly, we affirm in part, reverse in part, and remand with directions for the circuit court to grant Jones's motion for sentence credit.

## BACKGROUND

¶3 On May 29, 2016, at approximately 2:30 a.m., two masked African-American men entered the lobby of a Rodeway Inn in Eau Claire. They approached the desk where the clerk, Elena,[1] was working, and the first man—who was the shorter of the two—came behind the desk to where Elena was seated. The second, taller individual stood in front of the desk and told Elena to sit still and not move. The shorter individual emptied a nearby bag and thrust the bag at Elena, at which point she assumed she was being robbed. Elena testified that throughout the robbery, the shorter man never spoke and mostly kept his back turned to her. Elena found this movement unusual because, in this position, the man was facing a conspicuous camera in the lobby.

¶4 Elena stood and began emptying the contents of the cash drawer into the bag. The taller individual then told Elena to also empty the deposit drawer, which was where employees at the end of their shifts would deposit cash in excess of the cash drawer's $150 starting balance. Elena told the taller individual that the deposit drawer was locked and she did not have a key. Elena testified that most hotels have a safe rather than a deposit drawer, and that for someone to know about that drawer, they would need to have worked at the Rodeway Inn or have been told of the drawer by an employee.

¶5 After being told that the deposit drawer was inaccessible, the shorter individual approached Elena and began grabbing items that remained in the cash

---

[1] Consistent with the policy underlying WIS. STAT. RULE 809.86 (2017-18), we refer to the victim using a pseudonym. All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

3

drawer. That drawer's contents included a white Samsung cell phone charger belonging to another employee, which Elena had wrapped in white paper on which the employee's name was written. The shorter individual walked out from behind the desk, and Elena asked if she could sit down. The taller individual told Elena not to move, and he pulled up his shirt to reveal the handle of a handgun tucked into his pants. The robbers then left the building. Elena ran to a nearby office where the hotel owners were sleeping, and together they called 911.

¶6 Shortly before the robbery, Elena saw an older beige car slowly circling the parking lot. Elena knew the car belonged to Jones, whom she knew then only as "Sneak," and she identified Jones as the driver. At the time of the robbery, "Sneak" and Elena were staying with a mutual friend, who had also worked at the Rodeway Inn. Elena told the 911 operator about "Sneak" and told police he may have been involved in the robbery. Elena was sure the taller man was not Jones because of his voice and height, but she believed Jones might have been the shorter of the two African-American individuals she saw during the robbery.

¶7 Eau Claire police officer Benjamin Wutschke responded to the robbery and began looking for "Sneak," whom Wutschke knew to be Jones based on "past professional contacts." About one-half hour after the robbery, Wutschke located Jones driving alone in a tan vehicle approximately four to five miles away from the Rodeway Inn. Jones was taken into custody, and a search of his wallet and the vehicle yielded approximately $280 in cash, $135 of which was found in the vehicle's cup holder. No weapon was found in the vehicle, and police did not immediately seize the vehicle. Jones's arrest triggered a probation hold in two prior cases. The second, taller individual was never identified or apprehended.

¶8 Police subsequently returned to Jones's vehicle, which they had left at the scene of Jones's arrest, to attempt to match clothing found within it to the clothing seen in surveillance videos of the robbery. The clothing in Jones's car did not match the robbers' clothing. However, Jones's wife at the time, who picked up the vehicle after police had attempted to match the clothing, later notified police that she had found a white Samsung cell phone charger in the car. The charger had a piece of paper attached to it with a Rodeway Inn employee's first name on it. At the time of Jones's arrest, police had not yet been notified that a charger had been taken in the robbery, and they were looking only for money or a weapon.

¶9 Jones was tried for armed robbery as a party to the crime. At trial, surveillance video of the robbery was played for the jury. Detective Ryan Prock testified it was significant that in the video, the shorter suspect "does everything with his back to the victim[,] which leads me to believe that if they were to see each other, she would recognize him." Prock testified that he had personally viewed and photographed the piece of paper attached to the cell phone charger, but he did not know the significance of the evidence at that time and did not collect it.[2] Prock showed the photograph of the paper to one of the hotel owners, who advised him that a cell phone charger had been taken during the robbery. The hotel owner stated the paper in the photograph had come from his Rodeway Inn and had the hotel's property code on it, as well as an employee's name. Prock then reviewed the photographs of Jones's car taken when he was arrested. In the background of

---

[2] Prock testified he gave the note back to Jones's wife after viewing it during their initial encounter. Later, police obtained a search warrant for the vehicle and during its execution retrieved the paper from the glove compartment; the paper was introduced into evidence at Jones's trial. The cell phone charger was not recovered.

two of the photographs he noticed a white cell phone charger with a piece of paper attached to it.

¶10    The jury found Jones guilty.[3]  The circuit court sentenced Jones to a total bifurcated sentence of thirteen and one-half years, consisting of nine and one-half years' initial confinement and four years' extended supervision.  The sentence was ordered to be served concurrent to any other sentence.  The defense requested sentence credit, but the court declined to award any, stating it would set the amount of credit at zero and allow Jones to submit a future request for sentence credit with supporting authority.

¶11    Jones filed a motion for postconviction relief.  He argued: (1) the evidence was insufficient to support his conviction as a party to the crime of *armed* robbery; (2) he was entitled to a new trial in the interest of justice because the jury should have been instructed on the lesser-included offense of simple robbery and because testimony regarding Jones's nickname and prior police contacts "clouded the jury's consideration" of the crucial identity issue; (3) the circuit court erroneously exercised its sentencing discretion because it failed to explain how the duration of Jones's sentence advanced the court's articulated sentencing objectives; and (4) he was entitled to 204 days of sentence credit for the time he spent in custody between his arrest on May 29, 2016, and

---

[3] Jones elected to proceed pro se with standby counsel on the second day of trial.  He cross-examined the State's witnesses and presented his own witnesses, but he elected not to testify.  At the jury instruction conference, he consented to have the testimony of one of his witnesses stricken after the State presented evidence of fabrication to the court.

December 19, 2016, when he was sentenced after probation revocation in the earlier cases.[4]

¶12 The circuit court denied Jones's motion for postconviction relief. The court concluded the evidence at trial was sufficient to support inferences that Jones and his accomplice had extensively planned the robbery, that Jones knew his accomplice was armed, and that Jones had aided in the commission of the offense. The court also declined to order a new trial, observing that Jones had not requested an instruction regarding a lesser-included offense and that the evidence regarding Jones's nickname was "relevant and admissible." Finally, the court concluded it had adequately explained the reasons for Jones's sentence at the hearing, and it declined to award any sentence credit because Jones was not "in custody" on the armed robbery charge after his arrest and he had received sentence credit for the same time period in the earlier cases. Jones now appeals, raising the same claims he raised in his motion for postconviction relief.

## DISCUSSION

¶13 As explained above, Jones challenges various aspects of his trial and sentence. For the reasons that follow, we reject his challenges to the conduct of his trial and the sufficiency of the circuit court's sentencing rationale, and we affirm those aspects of the circuit court's decision. However, we conclude Jones is entitled to the sentence credit he seeks. We therefore reverse that portion of the

---

[4] Jones was sentenced in this case on March 1, 2017, several months after his sentencing after probation revocation. Jones's postconviction motion raised an issue regarding the DNA surcharge imposed at sentencing. Jones does not resurrect that argument on appeal, and we will not discuss it further.

circuit court's order and remand with directions for the court to grant Jones's motion for sentence credit.

## I. *Sufficiency of the Evidence*

¶14 The standard for reviewing the sufficiency of the evidence to support a conviction is highly deferential to the jury's verdict. ***State v. Beamon***, 2013 WI 47, ¶21, 347 Wis. 2d 559, 830 N.W.2d 681. We will not reverse a conviction unless the evidence, viewed most favorably to the State and the conviction, is "so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." ***State v. Poellinger***, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). The defendant bears the "heavy burden" of showing that the evidence could not have reasonably supported a finding of guilt. ***Beamon***, 347 Wis. 2d 559, ¶21.

¶15 Jones was charged with armed robbery as a party to the crime. Armed robbery, under the circumstances here, requires proof that a person took the property of another, with intent to steal, by threatening the imminent use of a dangerous weapon against the owner or another who is present with intent to compel that person to acquiesce in the taking. *See* WIS. STAT. § 943.32(1)(b), (2). A person is a party to a crime if he or she directly committed the crime or intentionally aided and abetted the commission of the offense. *See* WIS. STAT. § 939.05(2); WIS JI—CRIMINAL 400 (2005). The State's theory was that Jones was the shorter individual who kept his back to Elena and did not speak. Given

that the shorter individual never displayed a firearm, the State appears to have consistently relied upon aider and abettor liability as the theory for Jones's guilt.[5]

¶16 To obtain a conviction based on aiding and abetting a crime, the State must prove that the defendant: (1) undertook conduct, either verbal or overt action, that as a matter of objective fact aided another person in the execution of a crime; and (2) desired or intended that his or her conduct would yield such assistance. *State v. Ivy*, 119 Wis. 2d 591, 598, 350 N.W.2d 622 (1984).[6] An aider and abettor may be guilty not only of the crime that he or she knows the accomplices intend to commit, but also of different crimes committed that are a natural and probable consequence of the particular act that the defendant knowingly aided or encouraged. *Id.* at 596-97.

¶17 The application of these principles to crimes involving the use of firearms presents unique challenges for the prosecution in proving the defendant had the requisite intent to assist in the offense. Actual knowledge that the accomplice intended to use or threaten the use of a weapon is certainly sufficient, and it is a fact question for the jury. *See id.* at 599-600. Even absent such actual

---

[5] The jury was instructed that one can aid and abet an offense by directly committing that offense. Thus, the jury was not precluded from considering whether Jones was the individual who displayed the firearm, but the State does not appear to have advanced any such theory at trial.

[6] The circuit court instructed the jury in accordance with WIS JI—CRIMINAL 400 (2005), stating the following regarding aider and abettor liability:

> A person intentionally aids and abets the commission of a crime when, acting with knowledge or belief that another person is committing or intends to commit a crime, he knowingly either assists the person who commits the crime or is ready and willing to assist and the person who … commits the crime knows of the willingness to assist.

knowledge, a defendant may be found guilty of aiding and abetting armed robbery if the facts and circumstances of the case show that armed robbery was a natural and probable consequence of the robbery. *Id.* at 600. A weapon is so likely to be used in some types of robberies such that constructive knowledge is sufficient. *See id.* at 600-01.[7]

¶18    Here, Jones argues the trial evidence provided no reasonable basis for the jury to infer or otherwise find that Jones knew his accomplice was armed. Jones observes that there was no evidence he possessed a firearm during the commission of the offense, and he contends there was no evidence that he saw his accomplice show the weapon to Elena. The accomplice appears not to have brandished the weapon in an overt fashion, and no firearm was recovered by police. Jones emphasizes there was no evidence that, during the commission of the crime, the taller man said anything suggesting he had a weapon. Additionally, Jones observes that none of his post-arrest statements suggest he knew the second man was armed. Jones also argues that in considering Elena's testimony about the shorter man's movements in light of the surveillance video footage, it is not reasonably possible that the shorter individual was in a position to see the weapon during the brief moment that the taller individual raised his shirt.

---

[7] The jury instruction here was based solely on actual knowledge:

> To intentionally aid and abet armed robbery by use or threat of use of a dangerous weapon, the defendant must know that another person is committing or intends to commit the crime of armed robbery by use or threat of use of a dangerous weapon and have the purpose to assist the commission of that crime.

The omission of the "natural and probable consequence" instruction is the subject of one of Jones's interest-of-justice challenges, which we address later.

¶19     We reject Jones's assertion that the jury used "sheer speculation or guesswork" to conclude he had the requisite knowledge that his accomplice was armed.  At trial, the evidence showed that the robbery had been planned to such a degree that Jones and his accomplice did not need to speak to one another at all during the crime.  Surveillance video showed that the two individuals stood together in the parking lot for more than ten minutes before entering the hotel lobby together.  Once they entered the lobby, they immediately commenced performing what appear to be their predetermined roles in the robbery.  Jones emptied a bag, and he and Elena filled it with money and items from the cash drawer, all while the taller individual stood in front of Elena and issued commands to her.

¶20     Jones acknowledges this evidence, but he argues that for it to be probative of his knowledge, the State also needed to present direct evidence that their plan included the use, or threat of use, of a firearm.  In other words, Jones seeks a general rule that "evidence showing a plan to commit *a robbery* cannot by itself provide a basis to prove the extra elements necessary to prove aiding and abetting an *armed* robbery."  We reject such a blanket proposition.  When the commission of a robbery involves the use or threat of use of a firearm, the degree of the perpetrators' planning—as evidenced by their conduct both before and during the robbery or by direct evidence of their plan—may give rise to a reasonable inference that a particular defendant had actual knowledge that his or her accomplice was armed during the robbery.

¶21     The evidence also does not confirm Jones's assertion that based on his position and the direction he was facing during the incident, it was impossible that he could have seen his accomplice show the gun to Elena.  This court has reviewed the surveillance video of the robbery that was presented at trial.  Because

11

of the lobby camera's position, the taller man is obscured from view and it is difficult, if not impossible, to discern when he flashed the weapon, let alone to determine what Jones could see from his position at various times. Based upon the video, we cannot deem the jury to have engaged in unsupported speculation.

¶22 Moreover, because Elena's testimony described in a general fashion the sequence in which things happened, not precisely when they occurred, combining her testimony with the video does not establish that it was impossible for Jones to see that his accomplice was armed. Elena was specifically asked whether, from her perspective, Jones could have been aware the other individual was carrying a gun. She answered, "I can't say." Elena later stated she could not testify as to what Jones may or may not have seen. Contrary to Jones's assertions, Elena's testimony does not definitively establish that Jones could not see the firearm.[8] Based upon the totality of the trial evidence, the jury could reasonably infer that Jones had actual knowledge that his accomplice was armed and might use or threaten the use of the weapon.

¶23 Accordingly, we reject Jones's assertion that the inference of knowledge the jury drew was not supported by the facts of record. Jones presents a plausible view of the evidence that would have allowed the jury to draw an inference in favor of acquittal, but it decided not to do so. The jury is free to

---

[8] While Jones did not testify at his trial, he posits on appeal that as he was exiting from behind the desk and leaving the lobby, his view of his accomplice was "blocked by desk cabinets and his hood" and therefore he could not see the weapon. He cites only the surveillance video for this proposition, which (as we have discussed) is insufficient to form a conclusion about when his accomplice showed Elena a firearm or what Jones could see as the accomplice did so. Moreover, there is no testimony or evidence regarding what areas of the lobby were obscured from Jones's view at any particular time. The "guesswork and speculation" in this case appears to exist solely on Jones's part.

choose among conflicting inferences and may, within reason, reject the inference which is consistent with the accused's innocence. ***Poellinger***, 153 Wis. 2d 506. If the record supports more than one reasonable inference, we must accept the inference drawn by the trier of fact, unless that evidence is incredible as a matter of law. ***Id.*** at 506-07. That is not the case here.[9]

## II. *New Trial in the Interest of Justice*

¶24 Jones requests that we invoke our discretionary authority to order a new trial in the interest of justice on the basis that the real controversy has not been fully tried. *See* WIS. STAT. § 752.35. We exercise our discretionary reversal power sparingly and only in exceptional cases. *See **Vollmer v. Luety***, 156 Wis. 2d 1, 11, 456 N.W.2d 797 (1990). When determining whether a new trial is warranted because the real controversy has not been fully tried, we need not consider the probability that a retrial would produce a different outcome. ***Id.*** at 19.

¶25 Jones argues the real controversy regarding his guilt for armed robbery was not fully tried for two reasons. First, he argues the jury should have been given two additional instructions: (1) an instruction on the lesser-included offense of simple robbery; and (2) an instruction regarding the "natural and probable consequence" method of determining aider and abettor liability for an

---

[9] Having concluded there was sufficient trial evidence for the jury to infer that Jones had actual knowledge his accomplice used or threatened to use a firearm in the commission of the offense, we need not consider whether, under the circumstances of this case, Jones had constructive knowledge of the firearm because going armed was a "natural and probable consequence" of the robbery. We typically decide cases on the narrowest possible grounds, and we generally do not address issues that are not dispositive. ***Ehlinger v. Hauser***, 2010 WI 54, ¶66, 325 Wis. 2d 287, 785 N.W.2d 328.

offense involving an accomplice's use of a firearm. Second, he argues the trial testimony regarding his nickname and prior police contacts should have been excluded, and its inclusion improperly caused the jury not to focus on the actual trial issues but, rather, on Jones having the kind of bad character likely to have been involved in a robbery.

### A. Simple Robbery and "Natural and Probable Consequences" Jury Instructions

¶26 Jones first asserts that, based upon the lack of evidence suggesting that he knew his accomplice possessed a firearm during the robbery, the jury should have been given two additional instructions. First, he argues the jury should have been instructed regarding the lesser-included offense of simple robbery. The second instruction proposed by Jones, WIS JI—CRIMINAL 406 (2005), would have told the jury how to determine if the armed robbery was a natural and probable consequence of the robbery that Jones helped commit. Jones's argument seems to be impliedly rooted in the notion that these instructions were necessary for the jury to be able to validly adjudicate Jones's guilt in relation to the Rodeway Inn robbery.

¶27 A circuit court has broad discretion when instructing a jury. *State v. McKellips*, 2016 WI 51, ¶30, 369 Wis. 2d 437, 881 N.W.2d 258. The instructions given must accurately state the law. *Id.* We analyze the instructions as a whole to determine their accuracy, viewing them in the context of the overall charge. *Id.* As Jones observes, a proper jury instruction is a "crucial component" of the fact-finding process, and the validity of the jury verdict depends upon the completeness of the instructions. *See State v. Perkins*, 2001 WI 46, ¶40, 243 Wis. 2d 141, 626 N.W.2d 762.

¶28    Our interest-of-justice review is focused not on the circuit court's exercise of discretion in instructing the jury, but rather on whether the omission of the instructions caused the real controversy not to be fully tried. We need not reach the merits of this review because Jones concedes that he did not request either instruction at trial. The State acknowledges that had Jones requested these instructions, the court likely would have given them. However, the court was not required to give the instructions sua sponte. And although we may review an interest-of-justice claim even though the error has been waived, we note that under typical circumstances, "[t]he failure to request an instruction or to object effectively waives any right to review." *Bergeron v. State*, 85 Wis. 2d 595, 605, 271 N.W.2d 386 (1978).

¶29    To explain his failure to request the instructions, Jones leans heavily on his pro se status at the time of the jury instruction conference. However, the circuit court conducted a thorough colloquy with Jones about the risks of self-representation, including advising Jones that he would be held to the same standards as a lawyer. *See Waushara Cty. v. Graf*, 166 Wis. 2d 442, 452, 480 N.W.2d 16 (1992). At one point the court advised Jones that it believed he was "making a huge mistake."[10] Jones stated he wished to proceed, and the court found he "voluntarily and freely waived his right to be represented by counsel and is making a deliberate choice to proceed without counsel."

---

[10] Despite the circuit court's concerns, our review of the trial record shows Jones, as a general matter, performed creditably as his own attorney, particularly when cross-examining the State's witnesses.

¶30 Jones acknowledges that this court is not inclined to exercise its discretionary power of reversal in instances where the challenged error consists of a pro se defendant's conduct during trial. As we have previously explained:

> Inherent in a defendant's decision to represent himself is the risk that a defense not known to him will not be presented during trial. When a defendant undertakes pro se representation[,] that is the risk he knowingly assumes. If his strategy in proceeding pro se results in a valid defense being waived, it reflects the hazards of his decision to waive counsel. To rescue this defendant from the folly of his choice to represent himself would diminish the serious consequences of the decision he made when he elected to waive counsel.

*State v. Clutter*, 230 Wis. 2d 472, 477-78, 602 N.W.2d 324 (Ct. App. 1999). Moreover, ordering a new trial in the interest of justice based upon a defendant's own conduct would "encourage defendants to proceed pro se believing that they would have an opportunity to have a second trial with counsel if they were dissatisfied with the first verdict." *Id.* at 478.

¶31 Even aside from Jones's failure to request the instructions, there is no basis on the merits to conclude the real controversy was not fully tried in this case. With respect to the "natural and probable consequences" instruction, the defense theory at trial was that Jones was not one of the perpetrators. Jones's closing argument focused on inconsistencies in the witness testimony, certain witness opinions that he did not match the appearance of the shorter robber, and the lack of physical evidence linking him to the robbery. At no point did Jones argue in the alternative that he could be acquitted based upon his lack of knowledge that his accomplice was armed. Regardless of whether the instruction would have benefitted Jones in the manner he now argues, its omission—even

combined with the other issues Jones now raises in favor of a new trial—does not rise to the level of the real controversy not being fully tried.[11]

¶32    With respect to the lesser-included instruction, we observe that Jones was tried for armed robbery.  The instructions the jury was given "fully and fairly inform[ed] the jury of the rules of law applicable to the case and assist[ed] the jury in making a reasonable analysis of the evidence" as it related to the offense of being a party to the crime of armed robbery, even if the additional instructions Jones suggests might have been arguably beneficial to him.  *See* ***State v. Schultz***, 2007 WI App 257, ¶6, 306 Wis. 2d 598, 743 N.W.2d 823.  In this respect, we note the absence of the lesser-included instruction may have actually benefitted Jones, as it allowed for a complete acquittal if the jury concluded he did not know his accomplice was armed.  In all, we perceive no grounds for reversal based upon the absence of the two jury instructions.

### B.  Trial Testimony Regarding Jones's Nickname

¶33    Prior to trial, the prosecution notified the circuit court about potential issues regarding how police knew who "Sneak" was.  Jones then requested that no reference be made to his nickname at trial.  The court ruled that Jones could be identified as "Sneak" if that is how the witness knew him, but the prosecution could not inquire as to whether Jones had been previously arrested or convicted.

¶34    During the first day of trial, Jones objected to Elena's testimony in which she referred to Jones as "Sneak."  Consistent with its pretrial ruling, the

---

[11] If anything, the failure to give the "natural and probable consequences" instruction could have benefitted Jones, as that instruction would have given the jury a means to find Jones guilty of armed robbery even if the jury did not unanimously agree that he knew that his accomplice was armed and was going to use or threaten to use a weapon.

circuit court overruled the objection, reasoning that if Elena did not know Jones by his real name, it was "fair to allow the State to continue to use the name that she does know." Thereafter, Elena, two police officers, and the attorneys for both the State and Jones each made references to Jones as "Sneak." Additionally, one of the two police officers, Wutschke, testified that he knew who "Sneak" was based upon "past professional contacts" as a law enforcement officer.

¶35 On appeal, Jones argues his nickname had only limited relevance, which was to lay a foundation for Elena's identification of Jones and to establish how the police knew to investigate Jones. But, he argues, because Elena knew Jones by his real name at the time of the trial, the subsequent references to his nickname were cumulative and not relevant. Jones also asserts that his nickname "carries highly inflammatory connotations of thievery and dishonesty," making the subsequent references unfairly prejudicial. He argues all subsequent references should have been excluded under WIS. STAT. § 904.03, which permits the circuit court to exclude evidence for which the risk of unfair prejudice substantially outweighs any probative value.

¶36 Jones's evidentiary assertions, while perhaps relevant to the interest-of-justice analysis, do not establish that reversal is warranted. Rather, Jones must demonstrate that "the jury had before it evidence not properly admitted which *so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried.*" **State v. Hicks**, 202 Wis. 2d 150, 160, 549 N.W.2d 435 (1996) (emphasis added). Jones argues that "[w]hile one or two unnecessary references to Jones as 'Sneak,' or to his prior police contacts would not cloud the central issue at trial in this case, the multiple references had a cumulative impact that did." Jones therefore urges us to consider the collective

18

effect of the alleged errors on the jury's ability to adjudicate his guilt for armed robbery.

¶37    We conclude there was no error in the admission of the evidence, and certainly none that would warrant the exercise of our formidable power of discretionary reversal.  The testimony regarding Jones's nickname or how police knew him was plainly relevant.  "[I]t has been held that an alias is admissible when it forms part of the background of the case." *State v. Bergeron*, 162 Wis. 2d 521, 530, 470 N.W.2d 322 (Ct. App. 1991).  Here, as even Jones acknowledges, his nickname and information regarding his prior police contacts were relevant contextual evidence to explain whom Elena suspected of being involved in the offense and how the police knew to look for Jones based upon the information she provided.  The references to Jones's nickname at trial were only in the context of describing how Elena knew Jones and how the police came to suspect Jones's involvement, and the nickname was not used gratuitously as a general reference to Jones outside of those purposes.  The fact that the witness learns of the defendant's real name after the crime occurred is of no moment when the witness's testimony concerns past events, at which time the witness only knew the defendant by an alias.  These considerations are especially pertinent where, as here, the defense theory at trial concerns identity.

¶38    We specifically reject Jones's argument that the testimony about his nickname was "highly inflammatory" because it carried connotations of thievery and dishonesty.  Jones also posits that the nickname "suggest[ed he had] a propensity to steal and [led] the jury away from an assessment of the evidence." We have affirmed a circuit court's discretionary determination to admit similar evidence of an alias, both under WIS. STAT. § 904.03 and the "other acts" statute, WIS. STAT. § 904.04.  *See Bergeron*, 162 Wis. 2d at 530-32.  The fact that the

defendant chooses or otherwise has an alias that carries negative connotations is of no significance as long as the evidence is relevant and admitted for a proper purpose, such as context or identity. *See id.* at 532.[12]

¶39 Jones also argues the testimony that officers knew him through past professional contacts was the "functional equivalent of saying Jones has committed other bad acts." We disagree. It was important for the prosecution to draw a connection between Jones and the nickname "Sneak" in the context of confirming Jones's identity as one of the robbers, and the testimony regarding past professional contacts supplied that nexus. By framing the source of their knowledge in this way, the officers supplied an ambiguous explanation that allowed for innocent inferences, such as that Jones was a victim of a crime or a confidential informant. In any event, the brief references to the source of the officers' knowledge, even if combined with the testimony regarding Jones's nickname, did not so cloud the issue that we can conclude the real controversy was not fully tried. Again, this information went directly toward proving that one of the robbers was correctly identified.

### III. *Sufficiency of the Sentencing Rationale*

¶40 Jones next argues that the circuit court erroneously exercised its sentencing discretion. A circuit court's discretionary decision-making "must depend on facts that are of record or that are reasonably derived by inference from

---

[12] Jones argues **State v. Bergeron**, 162 Wis. 2d 521, 470 N.W.2d 322 (Ct. App. 1991), is inapposite because, unlike the defendant there, Jones did not provide an alias in an attempt to conceal his participation in a crime. However, the **Bergeron** court observed that the defendant's alias "also constituted part of the background facts of the case." *Id.* at 530. The same is true here, regardless of the timing or motive for Jones's adoption of an alias.

the record," and the court must reach "a conclusion based on a logical rationale founded upon proper legal standards." *McCleary v. State*, 49 Wis. 2d 263, 277, 182 N.W.2d 512 (1971). Judges must explain the reasons for the particular sentence they impose, although how much explanation is necessary will vary from case to case. *State v. Gallion*, 2004 WI 42, ¶39, 270 Wis. 2d 535, 678 N.W.2d 197.

¶41 A sentencing court's analysis should generally proceed as follows. The court must specify the objectives of the sentence on the record and identify the objectives of the greatest importance. *Id.*, ¶¶40-41. Sentencing objectives can include the protection of the community, punishment or rehabilitation of the defendant, and deterrence of others from committing similar offenses. *Id.*, ¶40. The court should describe the facts relevant to these objectives and explain, in light of the facts of the case, why the particular component parts of the sentence imposed advance those objectives. *Id.*, ¶42. "Courts must also identify the factors that were considered in arriving at the sentence and indicate how those factors fit the objectives and influence the decision." *Id.*, ¶43. In each case, the sentence imposed shall call for the minimum amount of custody or confinement that is consistent with the protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant. *Id.*, ¶44.

¶42 Here, Jones acknowledges the circuit court "explicitly referred to the primary sentencing factors." In the court's view, the objectives of the greatest importance were protection of the community and punishment. The court noted several aggravating factors, including the potentially violent nature of the offense given that Jones's accomplice was armed, the fact that Jones concealed his identity, and the apparent planning that had taken place prior to the crime. The court also stated, "I haven't given up hope for rehabilitation of the defendant." It

21

remarked that Jones was a "bright guy" who had competently represented himself despite the fact that he had not attended law school.

¶43 Nevertheless, Jones also had "a long history of criminal offenses dating back to 1998" and had "wasted some potential." The circuit court stated that "[i]f there's a light at the end of the tunnel here it's that at some point you'll be out, and I would hope that you'd make good use of the skills and talents that you have." The court inquired as to Jones's age and his educational and employment history, and it remarked upon Jones's apparent lack of remorse. The court explicitly considered and rejected probation as a sentence for a variety of reasons.

¶44 According to the circuit court, the sentence Jones received would involve "a significant period" of imprisonment and was designed to advance the objectives it had identified. The court stated: "And I just didn't pick numbers out of the air. Thinking this through, this [sentence] is going to put you, when all of this is done and you're no longer incarcerated, you're no longer on supervision, you'll be around 50." Accordingly, the court imposed nine and one-half years' initial confinement and four years' extended supervision, for a total bifurcated sentence of thirteen and one-half years.

¶45 Jones concedes the circuit court "provided a lengthy statement of its sentencing rationale, one which clearly supports the court's decision to impose a prison sentence as opposed to some other disposition." Still, he argues the court's explanation "fell short in one narrow but important way." According to Jones, the court did not adequately explain why the duration of each part of Jones's bifurcated sentence advanced the sentencing objectives it had articulated. Jones further asserts the court "failed to explain why the sentence it imposed is the

22

minimum amount of custody or confinement that is consistent with the primary sentencing factors."

¶46     We reject Jones's challenge to the sufficiency of the circuit court's sentencing remarks.  Jones appears to challenge only the length of his initial confinement, not the total length of his imprisonment.  For example, he argues that the court's goal to place him under supervision until he was fifty years old could have been achieved by imposing a shorter term of initial confinement—specifically, "six or seven years"—and a longer period of extended supervision. He also summarily asserts that "the goals of significant punishment for Jones and protection of the public can be achieved by a shorter term of [initial] confinement."  As a result, Jones appears to be arguing the court was required to justify, with precision, why the specific length of his initial confinement was necessary to meet the articulated sentencing objectives.

¶47     Jones's argument is not supported by existing sentencing law, which recognizes "that the exercise of discretion does not lend itself to mathematical precision." *Gallion*, 270 Wis. 2d 535, ¶49.  Indeed, our supreme court stated it did not expect circuit courts to explain, for example, the difference between sentences of fifteen and seventeen years.  *Id.*  This appears to be precisely the type of explanation Jones seeks here.  All that is required is "an explanation for the general range of the sentence imposed," *id.*, which the circuit court provided.  The requirement of an on-the-record explanation of the sentence imposed "is not intended to be a semantic trap for circuit courts." *Id.*  Here, the court expressly wanted to protect the public by keeping Jones out of the community—i.e., incarcerated—for a period of time.  Plainly, the court determined nine and one-half years to be the appropriate amount of time to accomplish that goal, while

still allowing Jones the opportunity to lead a productive life following his release into the community.

*IV.   Sentence Credit*

¶48    Jones's final argument, which we find meritorious, is that he is entitled to 204 days of sentence credit under WIS. STAT. § 973.155.   Jones was arrested on May 29, 2016.   At the time of his arrest, he was on probation in Eau Claire County case Nos. 2015CF396 and 2015CF455.   In each of those cases, the circuit court had withheld sentence and placed Jones on probation for four years.   Jones's arrest for the armed robbery triggered a probation hold in those cases.

¶49    The circuit court set (and Jones signed) a signature bond in the present case, but Jones remained in custody on the probation hold throughout the probation revocation proceedings.   On September 2, 2016, Jones's probation was revoked, and he was returned to the circuit court for sentencing after revocation in each of those cases.   On December 19, 2016, the court entered judgments of conviction imposing concurrent three-year sentences in each case.   Jones was awarded 212 days of sentence credit in each case, which included the period of his confinement from May 29, 2016, to December 19, 2016.

¶50    Jones asserts he is entitled to sentence credit in the present case for the time period he was in custody between May 29 and December 19, 2016, even though that time was also credited to the sentences imposed after revocation in case Nos. 2015CF396 and 2015CF455.   Jones observes there is no dispute he was in custody during that time, and that dual credit may be awarded because the sentence in this case was ordered to run concurrent to the sentences imposed after revocation, which Jones was serving at the time he was sentenced in the present

case. *See* ***State v. Rohl***, 160 Wis. 2d 325, 330, 466 N.W.2d 208 (Ct. App. 1991) (holding that dual credit may be granted only when sentences are concurrent). Whether a defendant is entitled to sentence credit requires that we interpret WIS. STAT. § 973.155, which presents a question of law. ***State v. Johnson***, 2009 WI 57, ¶22, 318 Wis. 2d 21, 767 N.W.2d 207.

¶51 Under WIS. STAT. § 973.155(1)(a), "[a] convicted offender shall be given credit toward the service of his or her sentence for all days spent in custody in connection with the course of conduct for which the sentence was imposed." "Actual days spent in custody" includes confinement related to an offense for which the defendant is ultimately sentenced, or for any other sentencing arising out of the same course of conduct, which occurs while the defendant is awaiting trial, being tried, or awaiting imposition of sentence after trial. ***Id.*** Such confinement includes custody of the convicted defendant which is, in whole or in part, the result of a probation hold. Sec. 973.155(1)(b).

¶52 The parties generally agree on the cases interpreting WIS. STAT. § 973.155 that are relevant to this issue. Most notably, in ***State v. Hintz***, 2007 WI App 113, 300 Wis. 2d 583, 731 N.W.2d 646, we concluded that the defendant was entitled to sentence credit for time spent in custody on an extended supervision hold, if the hold was at least in part due to the conduct resulting in the new conviction. ***Id.***, ¶8. Under ***Hintz***, the fact that a defendant was "released" on a signature bond with respect to the new offense does not sever the factual connection between the continued custody and the new offense. ***Id.***, ¶11. As this court reasoned, "just because a judicial officer released Hintz on a signature bond does not mean that Hintz's [probation] agent could not take the alleged behavior into account when placing the hold." ***Id.***

25

¶53 Subsequently, in *Johnson*, our supreme court explained that in deciding whether a defendant is entitled to a particular amount of sentence credit, a circuit court must make two determinations: (1) whether the offender was in custody under WIS. STAT. § 973.155; and (2) whether all or part of the custody for which sentence credit is sought was "in connection with the course of conduct for which sentence was imposed." *Johnson*, 318 Wis. 2d 21, ¶27. The connection between presentence custody and the sentence imposed must be factual; a mere procedural connection will not suffice. *Id.*, ¶33. However, any connection between a defendant's custody on a probation hold and a subsequent offense is severed when the defendant is sentenced after revocation, regardless of whether he or she is still awaiting trial on the subsequent offense. *State v. Beets*, 124 Wis. 2d 372, 378-79, 369 N.W.2d 382 (1985). A sentence after revocation generally begins on the date sentence is imposed. WIS. STAT. § 973.15.

¶54 Based upon these legal authorities, the State argues Jones is entitled to only seventy-three days of sentence credit. The State concedes credit is due to Jones for the time he was in custody between the date of his arrest and August 10, 2016, when he was given a signature bond in the present case. The State reasons that "[t]he signature bond severed any connection that [Jones's] custody had with the armed robbery case." The State also argues that there was merely a procedural connection, not a factual connection, between Jones's custody and the armed robbery case. It argues that although *Hintz* supports Jones's interpretation of WIS. STAT. § 973.155(1)(b), *Johnson* and one of the cases discussed therein, *State v. Beiersdorf*, 208 Wis. 2d 492, 561 N.W.2d 749 (Ct. App. 1997), demonstrate that he is not entitled to the full sentence credit he seeks.

¶55 We reject the State's arguments, principally because they fail to square with *Hintz*, by which we are bound. *See Cook v. Cook*, 208 Wis. 2d 166,

26

189-90, 560 N.W.2d 246 (1997) ("[O]nly the supreme court … has the power to overrule, modify or withdraw language from a published opinion of the court of appeals."). In ***Hintz***, we recognized that the imposition of a signature bond does not relieve the defendant of the consequences of an administrative hold based on a subsequent crime. *See* ***Hintz***, 300 Wis. 2d 583, ¶11. As a result, we agree with Jones that "[n]othing about the signature bond in the armed robbery case altered" the *factual* basis on which the probation hold was issued, nor did it alter the fact that the sentences imposed in each of the three cases were factually connected with the same course of conduct.

¶56 Neither ***Johnson*** nor ***Beiersdorf*** compel a different conclusion. In ***Beiersdorf***,[13] the defendant appeared before the circuit court on a charge of second-degree sexual assault of a child, pled guilty to that offense, and was released on a personal recognizance bond. ***Id.*** at 494. Prior to sentencing and while free on bond, Beiersdorf was alleged to have again had sexual intercourse with the child and was charged with bail jumping and two counts of misdemeanor sexual intercourse with a child. ***Id.*** at 495. Beiersdorf pled guilty to the bail jumping charge, in exchange for which the prosecution dismissed the two misdemeanor sexual intercourse charges. ***Id.*** Beiersdorf was sentenced to a ten-year prison term for the sexual assault charge, with an imposed and stayed five-year sentence on the bail jumping charge and five years' probation consecutive to the ten-year sentence. ***Id.***

---

[13] The State's use of ***State v. Johnson***, 2009 WI 57, 318 Wis. 2d 21, 767 N.W.2d 207, appears merely to be that of a post-***Hintz*** case that serves as a conduit to ***State v. Beiersdorf***, 208 Wis. 2d 492, 561 N.W.2d 749 (Ct. App. 1997), a pre-***Hintz*** case. The ***Johnson*** decision briefly discussed ***Beiersdorf***, *see* ***Johnson***, 318 Wis. 2d 21, ¶¶34-35, and in other instances cited to that case, *id.* ¶¶27, 33, 45, 49.

¶57 Beiersdorf was awarded forty-four days' sentence credit on the bail jumping charge for the time he was in custody between his arrest and sentencing, but he subsequently sought forty-four days' credit against his sexual assault sentence for the same time period. *Id.* We concluded no such credit was warranted under WIS. STAT. § 973.155 because "although in rather obvious ways Beiersdorf's bail jumping was figuratively 'related to' his second-degree sexual assault, his 'custody' literally was not 'confinement related to' the sexual assault for purposes of sentence credit." *Beiersdorf*, 208 Wis. 2d at 498. Merely because a defendant perceives a nexus between his or her confinement and another crime does not mean a factual connection exists for purposes of statutory sentence credit. *Id.*

¶58 The State appears to mistakenly perceive Jones's argument to be that any causal relationship between a particular crime and confinement is sufficient to warrant an award of sentence credit under WIS. STAT. § 973.155. To the contrary, Jones concedes that, under *Beiersdorf*, when a defendant is released on bond for a particular offense, and he or she subsequently is arrested for bail jumping for a new course of conduct, the confinement for the conduct resulting in the bail jumping charge is not factually connected to the first offense, even though the custody related to bail jumping would not have occurred but for the existence of the bond.

¶59 Jones's situation is materially distinguishable from the circumstances in *Beiersdorf*. In *Beiersdorf*, the defendant's custody on the bail jumping charge had only a procedural connection to the earlier sexual assault offense, in the sense that the State could not have charged bail jumping absent the bond. Here, the course of conduct related to the armed robbery triggered both the probation hold in the earlier cases and the new charges. This factual connection

28

between the course of conduct in the present case and Jones's confinement is no less in existence after the signature bond was given and signed than it was before that moment.[14]  *See Hintz*, 300 Wis. 2d 583, ¶11.  Thus, it can be fairly said that Jones was in custody in connection with the present offense until the date on which he was sentenced after revocation in the earlier cases.

¶60    Accordingly, we conclude Jones is entitled to the 204 days of sentence credit that he seeks on his sentence for armed robbery.  We reverse the circuit court's determination on that issue and remand with directions for the court to grant Jones's motion for sentence credit.  We affirm the judgment of conviction and the postconviction order on all other issues.

*By the Court.*—Judgment and order affirmed in part; reversed in part and cause remanded with directions.

Not recommended for publication in the official reports.

---

[14] By conceding that Jones is entitled to sentence credit in the present case between the time of his arrest and the time he was "released" on a signature bond, the State necessarily agrees that a factual connection existed during that time between Jones's custody and the armed robbery for which he was ultimately sentenced.  Nonetheless, it is undisputed that Jones remained in custody due to the probation hold as a result of his arrest for armed robbery.  Under these circumstances, it is the State that urges us to place dispositive weight upon a procedural mechanism, while failing to provide any authority for the notion that a factual connection between a particular course of conduct and a probation hold is severed by a signature bond on new charges related to that course of conduct.